UNITED STATES of America,
Plaintiff-Appellee,

v.

George William BRADY,
Defendant-Appellant,

and

Leroy Marshall, Defendant-Appellant.

Nos. 78–5115, 78–5116.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 4, 1978.

Decided April 6, 1979.

Rehearings and Rehearings En Banc
Denied May 25, 29, 1979.

Robert M. Stivers, Jr., Knoxville, Tenn. (Court-appointed), for defendant-appellant Brady.

Allen E. Schwartz, Knoxville, Tenn. (Court-appointed), for defendant-appellant Marshall.

John H. Cary, U. S. Atty., Edward E. Wilson, Knoxville, Tenn., for plaintiff-appellee.

Before CELEBREZZE, LIVELY and KEITH, Circuit Judges.

CELEBREZZE, Circuit Judge.

Appellants, George William Brady and Leroy Marshall, were found guilty by a jury of armed bank robbery wherein deaths occurred in violation of 18 U.S.C. § 2113(a), (e). Numerous arguments are raised on appeal, the only colorable ones being that the trial court erred by admitting into evidence photographs of the dead victims and that the introduction of expert testimony concerning microscopic comparisons of hair taken from the body of a victim and hair taken from appellant Marshall was plain error requiring reversal of his conviction. For the reasons stated below, we affirm the judgments of conviction.

On the morning of April 9, 1977, the Kodak Branch of the Citizens National Bank (hereinafter Kodak Bank) of Sevier County, Tennessee, was robbed. Three bank employees and one bank customer were killed by the robbers during the robbery. On the afternoon of April 9, 1977, the FBI received information from an undisclosed source that the individuals responsible for the bank robbery were the appellants, Brady and Marshall. On the evening of April 9, 1977, Marshall was contacted by the authorities in Newport, Tennessee. Marshall voluntarily submitted to an FBI interview. In the early morning hours of April 10, 1977, Brady was stopped while driving an automobile by a Sevier County Deputy Sheriff and taken to the Sheriff's department for questioning by the FBI.

During the FBI interview of Brady on April 10, 1977, Brady signed a consent to search form authorizing a search of his automobile. The search of the automobile resulted in the seizure of the entire amount of bait money taken from one of the bank tellers during the robbery and a .38 caliber pistol which subsequent firearms tests identified as the weapon which fired some of the bullets removed from the victims. Upon discovery and identification of the bait money, Brady was formally arrested for the commission of the bank robbery. A subsequent search of Brady's person incident to arrest disclosed $500 of bait money hidden in his shoes.

Clara Nell McClure testified that on the evening of April 9, 1977, Marshall arrived at her residence. She testified that Marshall appeared fidgety. The appellant gave her a bag containing $2,510. When the witness asked Marshall where he got the money, she testified that he said "Haven't you heard of the Sevier County Bank." FBI Agent Castleburry testified that on April 10, 1977, he received a gun in a paper sack and a jar containing money from Clara Nell McClure. Upon examination of the money, the FBI discovered it contained three bait bills taken during the Kodak Bank robbery.

Bobbie Rollins, daughter of appellant Brady, testified that appellants were together at her residence around noon on the day of the robbery. She stated that while she was driving the appellants to Newport, Tennessee, they asked her to pull off the

road near the Pigeon River in Cooke County, Tennessee. The appellants left the vehicle carrying a metal box and returned from the river without it. A metal box was subsequently found near the Pigeon River by James Kirkpatrick while searching for hen eggs. The Government introduced evidence that the Kodak Bank was in possession of keys to the lock on the stolen metal box and such keys opened the lock on the metal box found near the Pigeon River.

Clyde E. Williamson, one of Brady's friends, was an employee at the Ramada Inn in Pigeon Forge, Tennessee. He testified that Brady came to the Ramada Inn on the evening of April 9, 1977 and asked him if he would accompany Brady on a trip to California. Williamson testified that Brady wanted to leave that evening and remain in California for six months to two years.

Jesse Brooks testified that prior to 9:00 a. m. on the day of the robbery a man driving a brown or maroon vehicle asked him what time the Kodak Bank opened. The man who inquired about the bank's opening was accompanied by another man at the time. Brooks identified Marshall as the man who asked him the question. Brooks could not state who was accompanying Marshall.

FBI Agent Robert O. Seibert, having been qualified as an expert in firearms identification, testified that the pistol found in Brady's automobile was the weapon which fired bullets found in the bodies of the victims.[1]

Appellants both assert that the trial court committed reversible error when it allowed the Government to introduce into evidence photographs taken at the Kodak Bank of three of the dead victims' bodies. Appellants allege the trial court inappropriately admitted the photographs in light of their stipulation that four deaths did occur as a result of the robbery and the gruesome, inflammatory nature of the photographs. The Government contends the photographs were properly admitted into evidence within the sound discretion of the trial court.

Any resolution of the issue must begin with an analysis of Federal Rule of Evidence 403. Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Under this Rule, the admission of relevant, potentially prejudicial evidence is placed within the sound discretion of the trial court. Such discretion must be exercised by balancing the probative value of the evidence against its prejudicial attributes. If in the discretion of the court the probative value of the evidence is substantially outweighed by its prejudicial character, the evidence is inadmissible. *See, e. g., United States v. Phillips,* 575 F.2d 97 (6th Cir. 1978); *United States v. Roberts,* 548 F.2d 665 (6th Cir.), *cert. denied,* 431 U.S. 920, 97 S.Ct. 2188, 53 L.Ed.2d 232; 431 U.S. 931, 97 S.Ct. 2636, 53 L.Ed.2d 246; 433 U.S. 913, 97 S.Ct. 2984, 53 L.Ed.2d 1098 (1977); *United States v. Green,* 548 F.2d 1261 (6th Cir. 1977). In reviewing a decision of a trial court on this issue we must look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect. *United States v. Green, supra,* 548 F.2d at 1268; *Abernathy v. United States,* 402 F.2d 582, 584 (8th Cir. 1968). *See* J. Weinstein & M. Berger, Weinstein's Evidence ¶ 403[03] (1977).

When we apply the above principles to the facts of this case, we cannot conclude that the district court abused its discretion. The photographs, while not pleasant to behold, are not as gruesome as appellants would have us believe. They depict three of the four victims lying on the floor of the bank in pools of their own blood. The blood is the only distasteful aspect of the photographs inasmuch as the wounds are not visible nor are there any other indications of violence.

---

1. In light of this substantial, if not overwhelming, evidence of guilt, appellants' contentions that the evidence was insufficient to support their convictions are utterly devoid of merit. *See United States v. Green,* 548 F.2d 1261, 1266 (6th Cir. 1977).

■ Appellants have not only overstated the potential prejudicial impact of the photographs, they have also understated their probative value. Appellants argue that the Government did not need to use the photographs because appellants had stipulated that four deaths occurred as a result of the robbery. This is an incorrect reading of the stipulation. The stipulation was merely that the four victims "died by gunshot wounds to the head, or the deaths were caused by a gunshot wound to the head." Therefore, the government still had to prove that the killings were in the course of a robbery.[2] While the photographs were not absolutely necessary to prove this element of the crime, they were highly probative on the matter and the district court did not abuse its discretion in determining that this probative value outweighed their potential inflammatory nature.

Marshall contests the admission of expert testimony based upon a comparison analysis of hairs found on the body of one of the victims and sample hairs taken from Marshall. Marshall relies upon our decision in *United States v. Brown*, 557 F.2d 541 (6th Cir. 1977), as authority for proposition that such evidence is inadmissible.

In *Brown* this court articulated a four prong test applicable on review of a district court's decision to admit expert testimony of a scientific nature. We stated:

> [f]our factors must appear in the record to uphold the admission of expert testimony: 1. qualified expert; 2. proper subject; 3. conformity to a generally accepted explanatory theory; and 4. probative value compared to prejudicial effect.

*United States v. Brown, supra,* 557 F.2d at 556, *quoting United States v. Green*, 548 F.2d at 1268; *United States v. Amaral*, 488 F.2d 1148, 1152 (9th Cir. 1973). In applying this test to the facts in *Brown* we found the

Government had failed to lay a sufficient foundation for the introduction of expert testimony concerning hair comparisons performed through the technique of ion microprobic analysis.

In the present case the expert testimony permitted by the trial court was based on hair comparisons conducted through the use of an optical microscope. This procedure involved the preparation of two glass slides, one containing hairs from Marshall and the other containing hairs taken from the body of one of the victims. The two slides were placed under a comparison microscope and compared. A comparison microscope is a device which allows a microscopist to simultaneously view the hairs on each slide and compare them without having to shift fields of vision from one slide to the other. The expert testified on how the hairs resembled each other.

This particular type of testimony occurred in *Brown*, but only the ion microprobic analysis was challenged by the appellant. Our decision in *Brown* in no way forecloses the admissibility of such expert testimony.

■ We do hold, however, that the foundational requirements set out in *Brown* are equally applicable to expert testimony based on optical microscopic hair comparisons. These foundational prerequisites are needed to protect against the possible prejudicial dangers inherent in any expert scientific testimony at trial.

There are good reasons why not every ostensibly scientific technique should be recognized as the basis for expert testimony. Because of its apparent objectivity, an opinion that claims a scientific basis is apt to carry undue weight with the trier of fact. In addition, it is difficult to rebut such an opinion except by other experts or by cross-examination

---

2. The photographs also would have been highly probative of a charge that the killings were in the course of an attempt to avoid apprehension for the commission of the bank robbery. This is proscribed by § 2113(e), as well as a killing during the course of a robbery. The photographs could have been used to support the theory that appellants lined up all the victims and summarily executed them in order to leave no eyewitnesses to the crime. The indictment, however, only charged appellants with killings during the commission of the bank robbery, so this alternative theory could not support admission of the photographs.

based on a thorough acquaintance with the underlying principles. In order to prevent deception or mistake and to allow the possibility of effective response, there must be a demonstrable, objective procedure for reaching the opinion and qualified persons who can either duplicate the result or criticize the means by which it was reached, drawing their own conclusions from the underlying facts.

*United States v. Brown,* 557 F.2d at 556, *quoting United States v. Baller,* 519 F.2d 463, 466 (4th Cir.), *cert. denied,* 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975).

█ Our review of the record in this cause indicates that the first two of the four prongs of the *Brown* test were clearly demonstrated by the Government, *viz.,* qualified expert and proper subject. As to the fourth prong, Marshall vigorously challenged the probative value of the evidence, as compared to its prejudicial effect, before the district court. The expert himself testified that the microscopic comparisons could only show certain similarities between the hairs found on the victim and those from Marshall, as opposed to showing with any certainty that the hairs came from the same person. We agree with the district court, however, that the evidence had sufficient probative value to be admissible. The lack of certainty went to the weight to be assigned to the testimony of the expert, not its admissibility, and defense counsel did a creditable job of arguing to the jury that it should be assigned little weight. *See United States v. Holleman,* 575 F.2d 139, 145 (7th Cir. 1978); *United States v. Oaxaca,* 569 F.2d 518, 526 (9th Cir. 1978); *United States v. Cyphers,* 553 F.2d 1064, 1072 (7th Cir.), *cert. denied* 434 U.S. 843, 98 S.Ct. 142, 54 L.Ed.2d 107 (1977); *Williams v. Wolff,* 473 F.2d 1049, 1052 (8th Cir. 1973).

As to the third prong of the *Brown* test, we agree with Marshall that the Government presented no evidence as to the general acceptance of microscopic hair analysis in the scientific community. While it appears to have been implicit in the expert's testimony that the procedure was generally accepted, he never expressly so stated. This was error.

The nature of Marshall's objection, however, was limited to the alleged speculative nature of the tests. He never argued below that the procedure employed, regardless of the degree of certainty it yielded, was not generally accepted by the scientific community. Nor did he argue that the government had at least not demonstrated that it was generally accepted. Thus, Marshall did not object with the specificity required by Federal Rule of Evidence 103(a)(1) to preserve this assignment of error. Reviewing the matter, as we must, under the plain error test of Federal Rule of Evidence 103(d) and Federal Rule of Criminal Procedure 52(b), we find that the error complained of falls far short of that required for reversal in the absence of objection. No substantial right of Marshall was adversely affected. In the alternative, we would hold that the error was harmless beyond a reasonable doubt, within the meaning of Federal Rule of Criminal Procedure 52(a), in light of the other evidence against Marshall. *See* Note 1, *supra,* and accompanying text.

The appellants have raised many other issues on this appeal.[3] We have considered each one and find them to be without merit.

The judgments of conviction are affirmed.

**3.** Appellants challenged the propriety of the trial court's jury instruction concerning the permissible inferences which can be drawn from the possession of recently stolen property. The position taken by the appellants lacks merit. *See United States v. McCoy,* 472 F.2d 704, 706 (6th Cir.), *cert. denied, Matney v. United States,* 412 U.S. 921, 93 S.Ct. 2741, 37 L.Ed.2d

147 (1973); *Prince v. United States,* 217 F.2d 838, 839 (6th Cir. 1954); E. Devitt and C. Blackmar, Federal Jury Practice and Instructions § 44.11 (3d Ed. 1977). A recent decision of this court supporting appellants' position, *United States v. Jennewein,* 580 F.2d 915 (6th Cir. 1978), has been vacated on petition for rehearing. 590 F.2d 191 (6th Cir. 1978).