**CITY OF CLEVELAND,**
**Plaintiff-Appellant,**

v.

**The CLEVELAND ELECTRIC**
**ILLUMINATING COMPANY,**
**Defendant-Appellee.**

**No. 82–3053.**

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 15, 1983.
Decided May 24, 1984.

William B. Norris (argued), Hahn, Loeser, Freedheim, Dean & Wellman, Cleveland, Ohio, for plaintiff-appellant.

John Lansdale, Jr. (argued), Squire, Sanders & Dempsey, Cleveland, Ohio, for defendant-appellee.

Before MERRITT, MARTIN and WELLFORD, Circuit Judges.

WELLFORD, Circuit Judge.

The City of Cleveland appeals a jury verdict for Cleveland Electric Illuminating ("Cleveland Electric") in this antitrust case. On July 1, 1975, the City sued Cleveland Electric and several other utilities, alleging that they combined to restrain trade, to monopolize and attempt to monopolize the electric power market in Cleveland and surrounding service areas in violation of sections one and two of the Sherman Act. 15 U.S.C. §§ 1, 2. After the other defendants settled out of the case, the City amended its complaint to charge Cleveland Electric with a section two violation only—monopolization and attempt to monopolize in the relevant market. The first trial ended in a hung jury, the re-trial resulted in a jury verdict for Cleveland Electric, and is the subject of this appeal, wherein the City alleges prejudicial and erroneous rulings by the trial court.

A complete recitation of the facts is unnecessary because this court has already published three decisions on interlocutory appeals in this case with ample factual discussion.[1] A limited history will suffice. Municipal Electric Light Plant (Muny Light), the City's utility company, and Cleveland Electric have long been competitors in the electric power business. Cleveland Electric began generating and distributing electric power in the Cleveland area in 1892. In 1906, the City entered the electricity business by purchasing small generating facilities in neighborhoods newly annexed to the City.

Direct competition between the utilities was sparked by the City's construction of a power plant in 1911 and its offer of lower electric rates than Cleveland Electric's. Until the 1930's, Muny Light expanded rapidly, absorbing many of Cleveland Electric's customers, because of its lower rates.

During the following two decades of co-existence, Cleveland Electric adopted and began to implement a policy of eliminating competition within its service area, generally by acquisition. Muny Light became a special target of its attention. In the mid-1960's Muny began actively soliciting Cleveland Electric's customers because its new, 85 megawatt generator gave it the capacity to absorb new business. In response to Muny's expansion efforts, Cleveland Electric developed the "Muny Displacement Program," a corporate policy of providing free rewiring services to customers who switched from Muny to Cleveland Electric service. Cleveland Electric also endeavored to reach a "coexistence" agreement with Muny, whereby Cleveland Electric would supply Muny with a dependable interconnection to Cleveland Electric's power if Muny would raise its rates to Cleveland Electric's level.

At this same time, Muny began to develop problems with its generators which prevented it from supplying reliable service to its customers. Muny's generators, many of which were 25 to 50 years old, needed maintenance service, but no generator could be shut down for service because of the demand for power. Therefore, Muny sought Cleveland Electric's cooperation to construct an interconnection enabling Muny to draw on Cleveland Electric's generators. Muny needed the interconnection because its transmission system was completely surrounded by Cleveland Electric's and because it would need to build 75 miles of high-voltage transmission lines just to

---

1. *City of Cleveland v. Cleveland Electric Illuminating Co.,* 570 F.2d 123 (6th Cir.1978) (enforcing summary judgment on CEI counter claims of $13,458,528.48); *City of Cleveland v. Krupansky,* 619 F.2d 572 (6th Cir.), *cert. denied,* 449 U.S. 834, 101 S.Ct. 106, 66 L.Ed.2d 40 (1980) (denial of writ of mandamus to order more extensive discovery); and *City of Cleveland v.*

*Krupansky,* 619 F.2d 576 (6th Cir.), *cert. denied,* 449 U.S. 834, 101 S.Ct. 106, 66 L.Ed.2d 40 (1980) (denial of writ of mandamus ordering district judge to recuse himself). *See also City of Cleveland v. Cleveland Electric Illuminating Co.,* 538 F.Supp. 1227 (N.D.Ohio 1980) (publication of numerous district court orders on major issues throughout the district court litigations).

reach the other nearest available significant source of power. The utilities negotiated to establish an interconnection, either on a permanent basis or standby, from 1969 to 1972. In early 1973, Cleveland Electric received a direct order from the Federal Power Commission to interconnect, by means of a 138 kilovolt permanent interconnection. Even after the order, the parties disagreed over the type of the interconnection, as well as the costs for engineering and construction. Muny became seriously indebted to Cleveland Electric for past services, and by 1975 it owed almost $6,000,000.00.[2] These disagreements further delayed the interconnection necessary to Muny's survival as a power-generating utility. In the spring of 1972, a lawsuit by a third party, subsidized by Cleveland Electric, was filed challenging several aspects of the proposed interconnection.

Simultaneous with the interconnection negotiations, Muny was negotiating with the Power Authority of the State of New York (PASNY). Muny intended to purchase low-cost power from PASNY for distribution to its customers. To do this, Muny needed Cleveland Electric to "wheel" the power along its lines from the Pennsylvania border to Cleveland. Cleveland Electric refused. To add to Muny's troubles and its desperate need for PASNY power, the boiler for its 85 megawatt generator exploded in 1974. The explosion was the culmination of a series of malfunctions due to poor maintenance.[3] Muny attempted to repair the generator, but after spending several million dollars, it abandoned the effort. Muny ceased its power generating operations altogether in 1977.

At the time of the first trial, Muny's service area was a thirty square-mile area in the City of Cleveland. Cleveland Electric's transmission system completely over-

lapped with Muny's and extended well beyond the borders of Cleveland. Within the overlapping service area, Muny served 43% of the customers and Cleveland Electric served 57%. Muny's rates to private customers throughout its history have been lower than Cleveland Electric's, while Cleveland Electric's service has generally been better.

The City's arguments on appeal, and Cleveland Electric's responses, are complex and varied. In its first, and most significant complaint, the City charges that the trial judge erred when he refused to admit into evidence information about Cleveland Electric's secret sponsorship of a lawsuit challenging the FPC's 1972 order requiring Cleveland Electric to interconnect with Muny Light. Before the first trial, the parties stipulated that Cleveland Electric had, by means of an unnamed Cleveland law firm, induced one Charles Miller to file a taxpayer's suit in the state court system to enjoin the FPC-ordered interconnection between Cleveland Electric and Muny Light. Cleveland Electric never revealed its sponsorship of this litigation, but paid Miller for his troubles and provided him with expert opinion testimony to back his claim. The state court initially granted a temporary restraining order to keep the City from making any payments on work in progress for the interconnection but did not enjoin the work itself. Two weeks later, after holding hearings on the matter, the court dissolved the restraining order and declined to issue a permanent injunction.

■■■ The City attempted to introduce the "Miller Stipulations" into evidence at the second trial to demonstrate Cleveland Electric's anticompetitive intent to exclude Muny Light from the retail electric power market.[4] The trial judge ruled the stipula-

---

**2.** This court's prior order indicates that Muny owed Cleveland Electric approximately $13,450,000 as of 1976 not including interest "and the additional charges authorized in the FPC order of January 11, 1973." 570 F.2d at 126.

**3.** The FPC had· found that "[T]he City's past inability to furnish reliable, dependable service on the MELP [Muny] System ha[d] been due

primarily to incompetent management and inefficient operation." *See* 570 F.2d at 125.

**4.** The stipulations were admitted at the first trial, but only as rebuttal evidence after witnesses for Cleveland Electric had testified that Cleveland Electric had done nothing to interfere with the interconnection. At the second trial, de-

tions inadmissible on the basis of the *Noerr-Pennington* Doctrine. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). Under this doctrine, parties are immune from antitrust liability for "mere attempts to influence the passage or enforcement of laws." *Noerr*, 365 U.S. at 135, 81 S.Ct. at 528. The doctrine is intended to protect the first amendment rights of individuals to petition their government, not limited to the legislative branch, for redress of grievances. *Noerr-Pennington* immunity extends to efforts to influence administrative agencies and the courts. *See California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). *California Motor* also recognized a "sham" exception to the doctrine, where acts are not protected if they are means for achieving "substantial evils" or a deferring of a competitor from "free and unlimited access" to the agencies and courts. *Id.* at 515, 92 S.Ct. at 614.

The City argues that this lawsuit falls within this "sham" exception. That Cleveland Electric may have participated, even clandestinely, in a state court suit challenging the manner and means of interconnection ordered by FPC with the intention of gaining some business benefit over or eliminating its competitor, the City of Cleveland and Muny, is not a matter that comes with the "sham exception" recognized in *California Motor Transport Co., supra.*

■ As stated in *Hydro-Tech Corp. v. Sundstrand Corp.*, 673 F.2d 1171, 1175 (10th Cir.1982): [5]

The mere fact that Sundstrand may have instituted its prior action against Hydro-Tech with an anti-competitive intent, *i.e.*, with an intent to gain a business advantage over Hydro-Tech, does not, of itself,

bring Hydro-Tech's first claim for relief within the "sham exception" to the *Noerr-Pennington* doctrine.

If Cleveland Electric were substituted for Sundstrand, and the City for Hydro-Tech in the above language, it would be clear that the Miller lawsuit comes within the purview of the *Noerr-Pennington* doctrine. The mere filing of the single lawsuit, even if sponsored by Cleveland Electric with a primary intent to do harm to the City, was not a "sham" action that fits within the exception even if it was a surreptitious seeking to delay and challenge the interconnection, sought by the City. It was not an "interference with the business relationships" of a competitor. *Hydro-Tech, supra; Franchise Realty Interstate Corp. v. S.F. Loc. Joint Exec. Bd.*, 542 F.2d 1076 (9th Cir.1976), *cert. denied*, 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977). This Miller suit was not the kind of "baseless, repetitive claims" or "abuse of processes" that barred the City from "access to agencies and courts" as was determined to be the basis of a "sham exception" to *Noerr-Pennington* in *California Transport*, 404 U.S. at 513, 92 S.Ct. at 613.[6] The Miller action, if deemed to be that of Cleveland Electric, is not the kind of antitrust activity that is admissible to prove a Sherman Act violation.

■ The City argues further that the Miller stipulation comes within the "sham" exception because Cleveland Electric concealed its role in promoting the Ohio State Court suit and it was improper for a suit to be brought under the Ohio Code Section involved for the benefit of a private party (Cleveland Electric). The Miller suit was promptly dismissed; appeal was dropped within a short time, and there has been no indication of a finding by the state court itself that institution of the proceeding was an abuse of process or unlawful. Whether

---

fense counsel was wise enough not to make the same mistake twice.

**5.** A case in which Judge John W. Peck of this court participated as a member of the panel.

**6.** It is evident that the City had access to administrative agencies and to the courts to assert its claims and complaints against Cleveland Electric; the Miller suit lasted for only a matter of a few weeks, and the interconnection work was not substantially delayed thereby, if at all.

a single legal proceeding, even if found meritless, may be considered a basis of a "sham" exception in light of *California Transport* is not altogether clear. *See Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977). Other courts have split on this question; *see Landmarks Holding Corp. v. Bermant*, 664 F.2d 891, 896 (2d Cir.1981):

> In *Noerr* and *Pennington, supra*, the Supreme Court held that attempts to influence the legislative process, even though motivated by a desire to reduce or eliminate competition, were protected by the First Amendment. At the same time, however, the Court qualified this immunity by providing that such attempts would be actionable under the antitrust laws where they are a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relations of a competitor." *Noerr, supra*, 365 U.S. at 144, 81 S.Ct. at 533. *California Motor Transport v. Trucking Unlimited, supra*, expanded this "sham" exception, stating that "unethical conduct in the setting of the adjudicatory process" or the pursuit of "a pattern of baseless, repetitive claims" cannot seek refuge under the *Noerr-Pennington* doctrine since they constitute an abuse of process "effectively barring ... access to the agencies and courts." 404 U.S. at 512–13, 92 S.Ct. at 612–613. *Accord, Otter Tail Power Co. v. United States, supra*, 410 U.S. [366] at 380, 93 S.Ct. [1022] at 1031 [35 L.Ed.2d 359] (1973) ("repetitive lawsuits carrying the hallmark of insubstantial claims" are unprotected); *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 635 n. 6, 97 S.Ct. 2881, 2889, n. 6, 53 L.Ed.2d 1009 (1977) ("repetitive, sham litigation may constitute an antitrust violation") (plurality opinion); *see generally* R. Bork, The Antitrust Paradox 359 (1975); Fischel, *Antitrust Liability for Attempts to Influence Government Action: the Bases and Limits of the Noerr-Pennington Doctrine*, 45 U.Chi.L. Rev. 80 (1977). In short, abuse of the administrative and judicial process

through unethical lawyer conduct and repetitive filing of insubstantial claims is unprotected by the *Noerr-Pennington* immunity.

*Compare, Sage International, Ltd. v. Cadillac Gage Co.*, 507 F.Supp. 939 (E.D. Mich.1981). We cannot say that in the absence of a showing of clear abuse of process or repetitive, harrassing filing of meritless claims that the trial judge acted erroneously in holding that the stipulated Miller suit was not admissible.

■ Nor can we conclude that the trial court committed error under all the circumstances in excluding the stipulation from evidence although the City alleged that it would show Cleveland Electric's "purpose" or the "character" of its action in assisting and subsidizing Miller to bring the state court action. As before discussed, even if the purpose were anti-competitive, and the suit were designed to eliminate the City as a competitor, "[s]uch conduct is not illegal, either standing alone or as a part of a broader scheme...." *Mine Workers v. Pennington*, 381 U.S. at 670, 85 S.Ct. at 1593. The City's effort to introduce the evidence was to show the anticompetitive character and nature of Cleveland Electric's conduct in this episode as a part of the alleged broader pattern of conduct condemned by the Sherman Act, and to cast appellee and its counsel in the role of deceivers. This is not an admissable basis for its introduction in our view. Under Fed.R.Evid. 403, moreover, we believe the court was acting within the permissible bounds of discretion to exclude this evidence by reason of "the danger of unfair prejudice," confusing or misleading the jury, or because the evidence was cumulative. The trial court is to be given "very substantial discretion" in balancing between "probative value on the one hand" and "unfair prejudice" on the other in deciding whether or not to admit tendered evidence subject to objection. Judicial self-restraint is appropriate in these circumstances. *United States v. Long*, 574 F.2d 761, 767 (3d Cir.), *cert. denied*, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978);

*United States v. Zipkin,* 729 F.2d 384 at 389–390 (6th Cir., 1984).

As pointed out by the City's counsel in appellant's brief at p. 13, "CEI [Cleveland Electric] *admitted at trial* that it had been a CEI *objective* to reduce and *eliminate* competition with its competitor, Muny Light, although CEI carefully avoided any direct admission of antitrust liability," and that among the means of accomplishing this objective, "CEI sometimes sought to *avoid doing* and, in any event, did not wish to do things which would help Muny Light to compete more effectively." (Emphasis added). There was considerable proof introduced by the City to show that Cleveland Electric, despite its protestations to the contrary, delayed in effecting interconnections, even those ordered by FPC. There was also evidence, of which the trial court was aware, of attempts to get Muny Light to raise its rates by agreement, efforts to dislodge the City as a competitor by the Muny Displacement Program, delaying tactics on furnishing standby power and avoiding interconnections and misleading Muny Light in that respect, refusal to "wheel," opposing the City's efforts to obtain FPC assistance, and the like. In view of this other evidence, and Cleveland Electric's stipulated objective, this effort through Miller, described in Muny Light's brief (p. 43) as "its evasion of the City's request for an interconnection ... done with the intent to maintain and enhance its market position" was simply cumulative in its effect.[7]

Considering the Miller stipulation "in a light most favorable to its proponent [the City], maximizing its probative value and minimizing its prejudicial effect,"[8] we cannot find an abuse of discretion in its exclusion.

▮▮▮▮ Not only was the Miller stipulation evidence cumulative in its effect, but

also to admit it even for a limited purpose of rebutting the testimony of Cleveland Electric's Donald Hauser was to expose the jury to the danger of considering that proof for improper purposes—that of an anti-competitive act when it was not admissible for that purpose. *Feminist Women's Health Center v. Mohammad,* 586 F.2d 530, 543 n. 7 (5th Cir.1978), *cert. denied,* 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979). If we were to conclude, on the other hand, that the exclusion were an abuse of discretion, in light of the merely cumulative impact of that proof, and because the actual adverse effect of the suit upon Muny Light was insubstantial, we would not reverse the judgment rendered below on that account, because we deem it not sufficiently prejudicial to the City.

The City also contends that the trial judge erred in not granting collateral estoppel effect of certain findings of fact made in proceedings before the Nuclear Regulatory Commission (NRC). These proceedings began in 1974 in connection with applications by Cleveland Electric and four other utilities for licenses to build and operate nuclear power plants. Before issuing any such licenses, the Commission is required to make a determination, among other things, as to whether their issuance "would create or maintain a situation inconsistent with the antitrust laws." 42 U.S.C. § 2135(c)(5). Both the Justice Department and the City of Cleveland intervened in the proceedings to complain that Cleveland Electric and the other utilities had violated the antitrust laws in the past and that granting them licenses to operate the requested nuclear plants would maintain a situation inconsistent with the Sherman Act. After extensive hearings, the Commission's Licensing Board agreed with the City and the Justice Department. The

---

7. The City said, at p. 42 of its brief, that "the Miller suit was brought to block the construction of the pole line to be used for an interconnection between Muny Light and CEI."

8. In considering whether evidence should be excluded under Fed.R.Evid. 403, this court has

directed the quoted standard. *See United States v. Hans,* 684 F.2d 343, 346 (6th Cir.1982), quoting *United States v. Brady,* 595 F.2d 359, 361 (6th Cir.), *cert. denied,* 444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84 (1979).

Board found, among other things, as follows:

CEI's offer to interconnect [in the 1960's] was motivated by a desire to forestall construction of greater generating capacity by the City. The record is replete with references to CEI's avowed policy to eliminate MELP as a competitor. The offer here constituted a means toward that end.

[I]t was CEI's private intention to avoid a permanent parallel interconnection.

CEI delayed in reaching a mutual agreement on an intertie.

On July 8, 1971, CEI agreed to begin a study of a permanent synchronous interconnection. With a permanent, synchronous intertie now being inevitable, CEI sought to maximize Cleveland's economic burden. A CEI brainstorming session concluded that a two step approach would accomplish this....

Originally, the 11 kv load transfer arrangement was set up to supply Cleveland with maintenance power while MELP installed environmental control equipment on its boilers. After this was accomplished, CEI refused to supply MELP anything other than emergency power. When Cleveland needed power from CEI, the load transfer was operated in such a way as to cause an outage on MELP's system. From an operational viewpoint no outage need have occurred. CEI imposed severe operating problems, unnecessary restrictions and administrative delays on MELP before it could utilize the transfer system.

Administrative delays by CEI in energizing the 69 kv were worse than the delays encountered with the 11 kv system. Connection at 69 kv required CEI executive clearance and would at times require up to 12 hours notice before CEI would take any action on MELP's request. MELP's system would experience brown outs, blackouts, or voltage reductions while awaiting CEI approval of a request for power over the 69 k tie.

It would be impractical for Cleveland to construct transmission lines across CEI territory because of (1) cost, (2) environmental problems, and (3) the unlikelihood of obtaining siting approval for what would be duplicating transmission facilities.

Despite these findings the NRB granted Cleveland Electric the requested licenses to build the plants, subject to certain conditions intended to help the competitive situation between Cleveland Electric and Muny Light.

The NRB granted Cleveland Electric a favorable decision, although conditional, as indicated under 42 U.S.C. § 2135(c)(6) and (8). The findings indicated were made in the context of whether or not the license should be granted Cleveland Electric as one of the considerations involved in the Commission's ultimate decision under the Atomic Energy Act.

In *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) the Court found that it was appropriate for the doctrine of collateral estoppel to be applied offensively by a private plaintiff following court proceedings instituted against the defendant, Parklane Hosiery, by the SEC. The identical issues involving false representations in a proxy statement had previously been decided judicially both by a district court and affirmed by a U.S. Court of Appeals as a matter of factual findings and legal conclusions. The nub of the holding, however, was that the decision whether or not to apply collateral estoppel was left to the *broad discretion* of the district judge under the applicable circumstances:

We have concluded that the preferable approach for dealing with these problems in the federal courts is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to determine when it should be applied.

*Id.* at 331, 99 S.Ct. at 651 (footnote omitted).

■ Different procedures and burdens of proof apply in an administrative proceeding where Cleveland Electric was an applicant in one instance before the Nuclear Regulatory body, and in the district court

where it was a defendant in a jury trial accused of antitrust violations. Furthermore, in an earlier administrative proceeding, the FPC had made contrary factual findings related to alleged anti-competitive conduct by Cleveland Electric. In addition, the district court was uncertain as to the effect of certain irregular circumstances that surrounded the determination of the Commission in its review of the Board's initial decision. Finally, the agency decision sought to be applied by the City through collateral estoppel was not a final decision. A "valid and final judgment" is necessary before collateral estoppel can be invoked. *Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970). A finding of antitrust violations or conduct, moreover, is not within the special expertise of the Nuclear Regulatory bodies. For all these reasons, it was within the broad discretion of the district court to decide whether collateral estoppel should have been applied, and we find no abuse of discretion demonstrated under these circumstances by the district court's ruling not to apply it in this case.[9]

■ The City also takes issue with a number of the jury instructions given in this case. In general, we find the City's arguments to be without merit. First, the City complains that the trial judge improperly excluded from jury consideration wholesale electrical power as a relevant product market. We disagree. We agree with the trial judge that the only relevant product market in this case is the *retail* electrical power market. This is the only market in which Cleveland Electric and the City currently compete and the only market in which they are ever likely to compete. In defining a relevant product market, the goal is "to delineate markets which conform to areas of effective competition and to the realties [sic] of competitive practice." *L. G. Balfour Co. v. F.T.C.,* 442 F.2d 1, 11 (7th Cir.1971). The City offered no evidence that it ever had competed or ever intended to compete in the wholesale power market. Moreover, even if the trial judge had designated wholesale power as a relevant market, the City's position would not have improved. The evidence shows that there were a number of other potential sources of wholesale power in the region in addition to Cleveland Electric, *e.g.,* PASNY, Ohio Edison, and PENELEC. Cleveland Electric clearly had neither monopoly power in this market nor a dangerous probability of acquiring such a monopoly.

■ The City also claims that the trial judge's exclusion of the wholesale power market foreclosed the jury from considering whether Cleveland Electric used its monopoly of transmission lines to achieve a competitive advantage in the retail power market in violation of the Sherman Act. *See Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). This is not true. The trial judge specifically charged the jury that it could find that Cleveland Electric's refusal to wheel power over its lines to Muny Light was a violation of the antitrust laws, as a denial of access to an essential facility. *See e.g., Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *Byars v. Bluff City News Co., Inc.,* 609 F.2d 843 (6th Cir.1980) (as amended on denial of rehearing); *Gamco, Inc. v. Providence Fruit & Produce Building,* 194 F.2d 484 (1st Cir.), *cert. denied,* 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952). Perhaps it would have been appropriate to also instruct the jury that it was unlawful for a monopolist to use its monopoly power in one area to obtain a monopoly in another. However, there is no evidence that the City

---

**9.** Neither *Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979), nor *United States v. Utah Construction Co.,* 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966), relied upon by the City, compel a different conclusion. *Montana* involved the application of collateral estoppel within the context of res judicata where there had been a prior valid and final court decision on the legal and factual issues involved. *Utah Construction* involved a contractual provision which made a decision by the Contract Appeals agency binding and thus this agreement collaterally estopped the contractor's seeking a contrary court decision in a subsequent proceeding.

ever asked for such an instruction at trial. Moreover, the "essential facility" doctrine is sufficiently similar to the "monopoly leverage" doctrine that the jury had ample opportunity to consider the issue.

■ The City next contends that the trial judge erred in his instructions on the relevant geographic market. In particular, the City objects to the judge's instructions that the jury could not make Cleveland Electric's entire service area the relevant market and that it could not consider price influence when determining geographic market. The basic rule in establishing the relevant geographic market is that the market selected must "both 'correspond to the commercial realities' of the industry and be economically significant." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336–37, 82 S.Ct. 1502, 1529, 1530, 8 L.Ed.2d 510 (1962). What this usually boils down to in practice is the area of actual or potential competition between the parties involved in the case. *See Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 988–89 (D.C.Cir. 1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978); *American Football League v. National Football League*, 323 F.2d 124, 129–30 (4th Cir. 1963). While there have been instances where the geographic market has been defined as the defendant's service area, *see e.g., Otter Tail Power, supra,* 410 U.S. at 369–70, 93 S.Ct. at 1025–1026; *City of Mishawaka v. American Electric Power Co.,* 465 F.Supp. 1320, 1325–27 (N.D.Ind. 1979), *aff'd in relevant part,* 616 F.2d 976 (7th Cir.1980), the courts in these cases have emphasized the existence of actual or potential competition throughout the defendant's service area. In *Mishawaka*, for example, the competition came from the nine plaintiff cities who operated municipal power plants scattered throughout the defendant's service area. In *Otter Tail*, the competition was provided by several towns which operated their own power systems, several more which wanted to, and a host of additional cities which might want to in the future. *Otter Tail* is also somewhat unique because the plaintiff in the case was the United States government, and, as

such, it represented the interests of all cities whether parties to the litigation or not.

Without some kind of competition limitation on the relevant geographic market, some very anomalous results could be created. For example, we can imagine a situation in which one of the large regional telephone companies (one of the "fragments" remaining after the Bell System breakup) was competing with a local telephone company to provide service to a new town. It is possible that the local phone company might control 90% of the telephone business in the county where the new town is to be built. Yet, if we were to define the relevant geographic market as the service area of the regional phone company, the regional phone company would have monopoly power and would be subject to the special standard of business conduct applicable to its situation. This, we believe, is not a result intended by the antitrust laws and certainly not one that we will endorse.

■ In this case, the City introduced no evidence that it actually was competing for or ever planned to compete for customers in Cleveland Electric's entire 1700 square-mile service area. There was in the record evidence that the City was attempting to expand its operations beyond its 30 square-mile base in Cleveland, and that it was authorized to sell up to one-third of its power to areas outside of Cleveland. However, these proposed expansion activities could never provide effective competition throughout Cleveland Electric's entire service area. Therefore, it was proper for the trial judge to instruct the jury that the relevant geographic market was something less than Cleveland Electric's entire service area.

■ The trial judge was also correct in instructing the jury not to consider the effect, if any, of the City's electric rates on Cleveland Electric's rates when defining the geographic market. These instructions ruled out jury consideration of the so-called "price influence" theory. According to this

theory, the area of effective competition between two companies for a particular product can be determined, in part, by the way each company alters its prices in response to price changes made by the other. So, for example, two regional manufacturers of cement who do not normally sell in each other's area might be considered part of one larger geographic market if a price change in one area was matched by a price change in the other. In this situation, presumably transportation expenses are low enough so that a failure to match a competitor's price change would result in a flow of product from the less expensive area into the more expensive one, resulting in a loss of business for the manufacturer with the higher price. *See, e.g., RSR Corp. v. Federal Trade Commission,* 602 F.2d 1317 (9th Cir.1979); *cert. denied,* 445 U.S. 927, 100 S.Ct. 1313, 63 L.Ed.2d 760 (1980); *United States v. Bethlehem Steel Corp.,* 168 F.Supp. 576 (S.D.N.Y.1958). However, as Cleveland Electric correctly points out, this price influence theory only makes sense when suitable means of transportation exist from one area to the other. Because Muny Light lacks the distribution network to move electricity rapidly to Cleveland Electric customers dissatisfied by Cleveland electric rate hikes, the price influence theory is not applicable in this case. Therefore, even though the City argued that its lower prices placed heavy political pressure on Cleveland Electric not to raise its rates elsewhere, this kind of price influence should not have been considered by the jury because it did not relate in any way to the City's ability to compete with Cleveland Electric for customers. Were we to decide otherwise, a decision by a Chicago-based utility not to raise rates because other cities, like Cleveland were managing to avoid such increases, would create a basis for Cleveland (or Cleveland Electric) to argue that the relevant geographic market for electricity extended all the way to Chicago.

 The last jury instruction objected to by the City involves the trial judge's instruction on the effectiveness of regulation. The trial judge told the jury to presume that the Ohio utility regulatory commission properly exercise its authority to regulate Cleveland Electric's rates. From this, the City argues that the jury could conclude that state regulation protected Cleveland Electric from antitrust liability at least as relates to one aspect of monopoly power, the ability to control prices. According to the City, this is contrary to the holding of the Supreme Court in *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 596, 96 S.Ct. 3110, 3120, 49 L.Ed.2d 1141 (1976). In that case it was held that electric utilities are subject to the antitrust laws even when their actions are approved by state utility commissions. *See also, e.g., MCI Communications v. AT & T,* 708 F.2d 1081, 1103 (7th Cir.1983), *cert. denied,* ⸺ U.S. ⸺, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *IT & T v. Gen. Telephone & Electronic Corp.,* 518 F.2d 913, 935–36 (9th Cir.1975) ("regulation must be assessed simply as another fact of market life"); *United States v. AT & T,* 524 F.Supp. 1336 (D.C.D.C.1981). Nonetheless, even if the City is correct in its objections, the trial judge's error was harmless because the City's case against Cleveland Electric was not based on Cleveland Electric's ability to control prices,[10] but rather on its ability to exclude competition, the second test of monopoly power.

 The City also challenges the trial judge's orders limiting discovery in this case. In considering the City's claim we are aware, of course, that the trial judge has broad discretion in ruling on discovery matters. *See Chrysler Corporation v. Fedders Corp.,* 643 F.2d 1229, 1240 (6th Cir.), *cert. denied,* 454 U.S. 893, 102 S.Ct. 388, 70 L.Ed.2d 207 (1981). His decisions in this area will be upheld unless we find that they constitute "a gross abuse of discretion resulting in fundamental unfairness

**10.** It is conceded that Muny Lights' rates were lower than Cleveland Electric's rates through the relevant period.

in the trial of the case." *Phil Crowley Steel Corp. v. Macomber, Inc.*, 601 F.2d 342, 344 (8th Cir.1979), quoting *Voegeli v. Lewis*, 568 F.2d 89, 96 (8th Cir.1977). We find no such abuse here. There is ample evidence in the record that the City was simply remiss in failing to comply with reasonable discovery deadlines established by the trial judge. While the City may have been unable to obtain information it considered important to its case, its problems were largely self-inflicted. Moreover, our review of the record demonstrates that all issues in this case were fairly and vigorously contested. Any errors which the trial judge may have made in his discovery rulings, therefore, did not create the kind of "fundamental unfairness" which would justify a reversal.

■ In its final challenge on appeal, the City alleges that the trial judge improperly directed a verdict that Cleveland Electric was not liable for damages resulting from Muny Light's decision not to rehabilitate its 85 megawatt generating plant. The generator was originally put out of commission by an explosion in its main boiler. The City admitted that Cleveland Electric's conduct did not cause the original explosion. The City does, however, argue that Cleveland Electric's refusal to interconnect with Muny Light was instrumental in the decision not to repair the unit. There is no evidence in the record to support this contention. The City established that it began repairs on the unit, spent two million dollars, then decided not to finish. It did not offer any explanation as to *why* it abandoned the repair effort. As a consequence, any jury finding that the termination of the repair effort was caused by an unlawful act of Cleveland Electric would be based on "mere suspicion, conjecture, and speculation" and could not be upheld. *See Miller v. New York Produce Exchange*, 550 F.2d 762, 767 (2d Cir.), *cert. denied*, 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977). Therefore, the district judge properly directed a verdict on this issue.

For the reasons indicated, we AFFIRM the judgment of the district court. Each party to bear its own costs on appeal.

MERRITT, Circuit Judge, concurring.

I agree with the result reached in the opinion written by Judge Wellford and with its reasoning on the issues other than the admissibility of Cleveland Electric's conduct in the *Miller* lawsuit. By sponsoring the *Miller* lawsuit, Cleveland Electric sought to avoid the consequences of an order of the FPC requiring interconnection with the City's light company. My view that this conduct is irrelevant to the antitrust case is based on the Supreme Court's opinion in *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

The Supreme Court decided in *Otter Tail* that the authority of the Federal Power Commission to order interconnection does not create an immunity for electric power companies from antitrust regulation. In *Otter Tail*, the Supreme Court said that determinations of the FPC are in the main separate from and irrelevant to antitrust regulation. The FPC may order electric utilities which come before it to take certain actions in the public interest, and its orders may be informed by antitrust considerations if they are relevant; but, under the reasoning in *Otter Tail*, the two regulatory schemes—federal power regulation under the jurisdiction of the FPC and antitrust regulation under the federal courts— are otherwise entirely distinct. Given this, it seems improper to allow evidence of a party's efforts to avoid the enforcement of an FPC order to which it takes exception to be used against that party in a private antitrust action.

Antitrust questions concerning preemption, the state action exemption, and exclusive and primary antitrust jurisdiction in connection with the regulation of utilities are legal questions. Resistance to a non-antitrust, FPC administrative order may give rise to administrative contempt proceedings, but I would not allow such resistance to create an inference of anti-competi-

tive intent or to be used to allow a jury to impose antitrust liability. A competitor should have to prove his antitrust case without regard to the non-antitrust litigation before the administrative agency or in the courts concerning the administrative agency's actions. For this reason, I believe the District Court was correct in excluding evidence concerning the *Miller* case.

In other words, if, as *Otter Tail* held, orders of the FPC respecting interconnection and wheeling of electric power are not primary and do not insulate a utility subject to those orders from antitrust liability, I do not see why resistance to those orders through further litigation should be allowed to be used to create an inference of anticompetitive intent on the part of Cleveland Electric, as Muny Light argues. In my view, the issue goes beyond the *Noerr-Pennington* doctrine. It is an issue of basic fairness and reciprocity. If FPC regulatory litigation and orders do not displace antitrust litigation because the two are viewed as separate regimes of law, why should litigation in the regulatory area be used to establish antitrust liability?

Issues involving the relationship between antitrust enforcement and administrative regulations are especially complex and difficult:

> Because the problem is so complex, the doctrines that the courts have fashioned to deal with it are, not surprisingly, tools of less than surgical precision. Moreover, the doctrines simply are not applied with any discernible consistency.

6 J. VON KALINOWSKI, ANTITRUST LAWS AND TRADE REGULATION § 44A.01[1] (1983). If these issues are confusing for courts, how can we expect a jury rationally to decide on the antitrust consequences of a competitor's resistance through litigation of an order of interconnection by an administrative agency, an order not based on antitrust considerations? Admission of such evidence would simply confuse the jury.

BOYCE F. MARTIN, Jr., Circuit Judge, dissenting.

This is a complicated case with a complicated past. It presents a number of diffi-

cult antitrust issues in a unique setting. Moreover, it has already been before a jury twice, and a reversal by this Court would require yet another trial. For these reasons, I can sympathize with the majority's desire to uphold the trial judge's rulings and dispose of the case once and for all. Nonetheless, where, as here, the trial judge has committed clear error, I believe this Court has an obligation to reverse and remand no matter what the consequences. Accordingly, I must dissent as to the majority's rulings on both the admissibility of the Miller Stipulations and on the collateral estoppel effect to be given the findings of fact by the Nuclear Regulatory Commission.

On the Miller Stipulations issue, I conclude that the district court erred in excluding the Miller Stipulations from evidence because they were admissible to show "the purpose and character of the particular transactions under scrutiny." *United Mine Workers v. Pennington*, 381 U.S. at 670 n. 3, 85 S.Ct. at 1594 n. 3 (1965). Under this caveat to the *Noerr-Pennington* doctrine, acts which are not in themselves actionable under the antitrust laws nonetheless can be admitted into evidence if "probative and not unduly prejudicial." The test here is the same as that under Fed.R.Evid. 403. Under this standard, the trial judge is required to view the evidence "in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Hans*, 684 F.2d 343, 346 (6th Cir.1982), quoting from *United States v. Brady*, 595 F.2d 359, 361 (6th Cir.1979).

In this case, the trial judge failed to employ this standard. He did not give any consideration to the probative value of the stipulations despite the fact that this evidence was crucial to the City's case. The jury was instructed that in order to find Cleveland Electric had a specific intent to monopolize, a necessary element of an attempt to monopolize violation, it must find not just that "CEI 'wanted to win the competitive struggle'" but that it "intended to remove its opposition by unfair or unrea-

sonable means." The evidence in the Miller Stipulations goes right to the heart of the question of whether Cleveland Electric's means were unfair or unreasonable, particularly when the jury also had before it claims by Cleveland Electric that it was trying its best to comply with the Federal Power Commission order.

Moreover, in considering the prejudicial effect of the evidence, the trial judge did not look to what is normally considered prejudice in an evidentiary setting, that is, whether or not the evidence would inflame the jury's passions against the defendant or otherwise make it decide the case on a basis unrelated to the merits, but rather to whether admission of the evidence would prejudice Cleveland Electric's first amendment rights. *See City of Cleveland v. Cleveland Electric Illuminating Co.*, 538 F.Supp. 1257, 1278–79 (N.D.Ohio 1981) ("To adopt the City's position would emasculate and indeed gut the constitutional protection afforded under the *Noerr-Pennington* doctrine and have a 'chilling effect' upon the exercise of First Amendment rights.") While I am aware that another court has apparently adopted a similar approach, *see Feminist Women's Health Center v. Mohammad*, 586 F.2d 530, 543 n. 7 (5th Cir. 1978), *cert. denied,* 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979), I do not believe that this was the test laid down by the Supreme Court in *Pennington* when it said that such evidence was admissible if

> probative and not unduly prejudicial, under the "established judicial rule of evidence that testimony of prior or subsequent transactions, which for some reason are barred from forming the basis for a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transactions under scrutiny."

*Pennington, supra,* 381 U.S. at 670 n. 3, 85 S.Ct. at 1593–1594 n. 3. The way I read this language, decisions about probative value under *Noerr-Pennington* are to be made just as they would in any other case.

Moreover, even if I were to agree with the trial judge's formulation of what constitutes prejudice in this case, the deference which he gives to first amendment rights is much too absolute. If, given the significance of the Miller Stipulations to its case, the City's attempt to take advantage of the evidentiary exception to *Noerr-Pennington* will "gut" the protections afforded by *Noerr-Pennington,* it is difficult to think of any attempt which would not.

I note that Cleveland Electric, on appeal, attempts to justify the trial judge's decision to exclude the Miller Stipulations based on traditional probative/prejudice calculations. It does not succeed. It argues first that the probative value of the stipulations was slight because merely cumulative, Cleveland Electric having already admitted that it desired to eliminate competition between itself and Muny Light. Cleveland Electric also claims that the Miller Stipulations would be highly prejudicial because they would "impugn" the character of its general counsel, who had written a letter to Muny Light stating that he would be happy to work with the City on the interconnection while, at the same time, recruiting Mr. Miller to file his lawsuit against the interconnection. I have already stated my belief that the evidence was highly probative. As to Cleveland Electric's claim of prejudice, if the jury was inclined to conclude that Cleveland Electric's attorney was acting duplicitously, that is not prejudice, it is common sense.

Accordingly, because I find no justification whatever for the exclusion of the Miller Stipulations from evidence, and because I find that this evidence was a crucial part of the City's case, I would reverse the trial judge on this issue and remand the case for a new trial.

I also believe that the trial judge erred in not granting collateral estoppel effect to the findings of fact made in proceedings before the Nuclear Regulatory Commission.

It is well-settled that collateral estoppel effect can be given to final decisions of administrative agencies. *See Kremer v. Chemical Construction Co.*, 456 U.S. 461, 484 n. 26, 102 S.Ct. 1883, 1899 n. 26, 72

L.Ed.2d 262 (1982); *United States v. Utah Construction Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966). The doctrine may, however, be more selectively applied in the administrative context. *See United States v. Lasky,* 600 F.2d 765, 768 (9th Cir.), *cert. denied,* 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979). In any event, "Neither collateral estoppel nor res judicata is rigidly applied. Both rules are qualified or rejected when their application would contravene an overriding public policy or result in manifest injustice." *Tipler v. E.I. duPont deNemours and Co.,* 443 F.2d 125, 128 (6th Cir.1971). The trial judge gave four different rationales for his refusal to give collateral estoppel effect to the Commission's findings: (1) the Commission's findings conflicted with findings on the same issues made by another administrative agency, the Federal Power Commission; (2) it was impossible to determine the specific factual findings underlying the Commission's decision because of the irregular manner in which the Commission's Appeal Board issued its decision; (3) the statutory mandate of the Nuclear Regulatory Commission is different from that of a federal court sitting in an antitrust action; and (4) the decision of the Commission was not final. Because I disagree with the trial judge's conclusions,[1] and because I do not believe that giving collateral estoppel effect to the Commission's findings of fact would "contravene public policy or result in manifest injustice," I would give collateral estoppel effect to the Commission's findings of fact.

The initial argument against using collateral estoppel is based on the conflicting factual findings of the Nuclear Regulatory Commission and the Federal Power Commission. According to the trial judge, because each agency's findings should be entitled to the same collateral estoppel effect, neither can be given any. I disagree. As the trial judge's own order acknowledges, the factual findings made by the Federal Power Commission relative to alleged anti-competitive conduct were not at all essential to its ultimate decision, that a temporary, emergency interconnection should be built between Cleveland Electric and Muny Light. *See City of Cleveland v. Cleveland Electric Illuminating Co.,* 538 F.Supp. 1227, 1234 (N.D.Ohio 1980). If a factual finding is not essential to an agency decision, it is not entitled to be given collateral estoppel effect. *See United States v. School District of Ferndale,* 577 F.2d 1339, 1349 (6th Cir.1978); *Continental Can Co., U.S.A. v. Marshall,* 603 F.2d 590, 594–5 (7th Cir.1979); 1B *Moore's Federal Practice* ¶ 0.441[2], at 729–30 (2d ed. 1974). The statute pursuant to which the Federal Power Commission issued its order authorizes the Commission to require interconnection when it is in the public interest. 16 U.S.C. § 824a. The Commission found that the unstable nature of Muny Light's generating system required that an interconnection be built. The City had also argued that the public interest required the interconnection because Cleveland Electric was operating in an anti-competitive manner. The administrative law judge rejected these contentions, but this rejection clearly was not necessary to his ultimate decision, because he had already concluded that an interconnection was necessary. Moreover, as the City points out, the Federal Power

---

**1.** I note that the district judge believed that he was entitled to exercise "broad discretion" in deciding whether to employ collateral estoppel. *See City of Cleveland v. Cleveland Electric Illuminating Co.,* 538 F.Supp. 1227, 1232 (N.D.Ohio 1981). The majority seems to agree. However, in the case which is cited for this proposition, *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), the Supreme Court was referring only to decisions concerning the use of so-called "offensive" collateral estoppel. In such cases, where there is no mutuality between the parties, the Court recognized that there could exist many complicating circumstances that would make the imposition of collateral estoppel unfair in particular cases. The Court's solution to this problem was to give the trial judge broad latitude in considering whether to apply the doctrine in a given case. When, as here, there *is* mutuality between the parties, these considerations do not apply. The decision to invoke or not to invoke collateral estoppel becomes a question of law, and like all such questions, is freely reviewable by this Court.

Commission hearings were conducted in March, 1972, and did not consider evidence of Cleveland Electric's conduct after that time which was available to the Nuclear Regulatory Commission at its hearings. Finally, there was no full and fair hearing on the anticompetitive issues as is required to actuate the doctrine. *See id.*, at ¶ 0.441[3.3]; *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 480–81, 102 S.Ct. 1883, 1896–1897, 72 L.Ed.2d 262 (1982).

The second reason given to deny collateral estoppel effect was the irregular circumstances surrounding the issuance of the Commission's decision. After the Licensing Board made its initial decision, Cleveland Electric and the other utilities appealed to the three-member, Nuclear Regulatory Commission Appeal Board. One member of that Board, Mr. Sharfman, wrote an opinion affirming in relevant part the Licensing Board's determinations and its findings of fact. However, before the other members could complete their review of his opinion, Mr. Sharfman left the Appeal Board and entered the private practice of law. To avoid any appearance of impropriety, the remaining members did not discuss the case further with Mr. Sharfman. They wrote a separate opinion generally concurring in Sharfman's opinion, but with certain exceptions, particularly as regarded relief. The trial judge found that certain language in their concurring opinion made it impossible to decide just what the three members were agreeing to:

> Had Mr. Sharfman remained a member of this Board, or continued to be available for consultation, we might well have suggested revisions in his treatment of certain issues and have endeavored in other respects to persuade him of the correctness of our views (particularly on the question of relief) to the extent that they do not coincide with his. Those options have not been open to us. In the circumstances, we file his opinion as it was presented to us. We concur in its ultimate factual and legal conclusions and the result it reaches except where

indicated in our separate opinion, which follows immediately.

I do not share this uncertainty. The other two members specifically stated that they concurred in Sharfman's "ultimate factual and legal conclusions" except where indicated in their separate opinion. That separate opinion shows no disagreement with any of the factual findings at issue here. Therefore, I do not agree that this provides a sufficient basis for declining to apply collateral estoppel.

The trial judge also declined to give collateral estoppel effect to the Nuclear Regulatory Commission's findings because he found that the statutory mandate of the Commission differed significantly from that of a federal court sitting in an antitrust case. I do not agree with this argument, either. The statute at issue, 42 U.S.C. § 2135(c)(5), directs the Commission "to make a finding whether the activities under the license would create or maintain a situation inconsistent with the antitrust laws." In order to do that, the Commission must examine the past conduct of the utilities to determine if they have committed antitrust violations. This is exactly the task of the trial judge in a Sherman Act monopolization case.

The cases cited by the trial judge are readily distinguishable. In *Tipler v. E.I. duPont deNemours and Co.*, 443 F.2d 125 (6th Cir.1971), this Court was presented with a situation in which the statutory mandates truly were different. The defendant was asking the Court to grant collateral estoppel effect in a Title VII race discrimination case to a NLRB finding that an employee was fired for cause and not for his union activities. The Court properly held that because the NLRB's task was to determine only if union activities led to the employee's discharge and not whether he was dismissed because of his race, it would not give collateral estoppel effect in the Title VII race discrimination case to the NLRB's decision that the employee was properly discharged for cause.

The trial court also cited as support for its order a decision by another Nuclear

Regulatory Commission Licensing Board refusing to grant collateral estoppel effect to a federal district court's conclusion that certain utilities were not guilty of antitrust violations. *See In Re Matter of Houston Lighting & Power Co.,* 10 N.R.C. 563 (1979), *aff'd by Appeal Board,* 11 N.R.C. 14 (1980). This case is also not relevant. There, the Nuclear Regulatory Commission was refusing to apply collateral estoppel to a conclusion of law by the district court, that there was no antitrust violation, and not to the findings of fact. In addition, there actually were different legal standards involved. The district court's decision considered only section one, conspiracy allegations whereas the Nuclear Regulatory Commission was prepared to consider section two, monopolization and section five, unfair trade practices charges. In our situation, the Commission concluded that Cleveland Electric had committed section two, monopolization and attempt to monopolize violations. These are the issues that would be tried on remand, and it is only the factual findings which support those conclusions that the City seeks to have granted collateral estoppel effect.

Finally, the trial judge found that he could not give collateral estoppel effect to the Appeal Board's findings because the agency's decision in the case was not final. Cleveland Electric and the other utilities had petitioned the full Commission to review the Appeal Board's decision. The Commission cannot change the Appeal Board's findings of fact, but it can change its conclusion of law. Moreover, any decision by the full Commission could be appealed to the federal court of appeals. *See* 42 U.S.C. § 2239, 28 U.S.C. § 2342. A final decision is necessary before collateral estoppel can be invoked. *See Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970). Nevertheless, because neither party raised this issue on appeal, I assume that the Commission's decision has indeed become final. In any event, the passage of time would cure any questions about finality if this case were heard on remand.

For these reasons, then, I would grant a new trial.