983 F.2d 1069
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
David HOLMES, Defendant-Appellant.
 Nos. 91-2340, 92-1093.
 United States Court of Appeals, Sixth Circuit.
 Dec. 31, 1992.
 
 Before RALPH B. GUY, JR. and ALAN E. NORRIS, Circuit Judges, and JOHN W. PECK, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant, David Holmes, appeals his conviction on seven counts of mail fraud pursuant to 18 U.S.C. § 1341, one count of bank fraud pursuant to 18 U.S.C. § 1344, and eight counts of interstate transportation of forged checks pursuant to 18 U.S.C. § 2314. In his appeal, defendant raises the following allegations of error: (1) the trial court erred in admitting into evidence several hundred loan applications seized at defendant's residence; (2) the trial court's admission of evidence that defendant allegedly defrauded a credit union was plain error; (3) the prosecutor engaged in egregious misconduct sufficient to constitute a due process violation. The United States cross-appeals, alleging that the trial court improperly departed downward from federal sentencing guidelines. We find defendant's contentions on appeal to be without merit and affirm his conviction. We sustain the government's cross-appeal and remand for resentencing.
 
 I.
 
 2
 The charges against defendant in the instant case arose from a scheme whereby Holmes obtained loan application fees from consumers by falsely representing that he could obtain loans for them. He then made available such "loans" by providing applicants with forged and counterfeit checks. In doing so, he also defrauded a credit union by negotiating forged and counterfeit checks through his credit union account.
 
 
 3
 During the period from 1987 to 1989, defendant, doing business as D.A.P. Enterprise, represented in newspaper advertisements and in flyers that, for a small fee, he could obtain loans for people. Holmes sent loan application forms to those who responded to his advertisements. They in turn filled out and returned the applications with a fee ranging from $5 to $35. Several hundred completed applications were discovered by federal agents upon a search of Holmes' residence. Business records of D.A.P. Enterprise, which were also seized, demonstrated no attempt by defendant to obtain any loans.
 
 
 4
 The mail fraud charges contained in the indictment were based upon the mailing of loan applications and the return mailings of the completed applications and the application fees to Holmes. The bank fraud charge was based upon his scheme to defraud and obtain money from Co-op Services Credit Union by opening savings and checking accounts at the institution and then negotiating six forged and counterfeit checks which were drawn on the account of Heritage Exchange, a marketer of financial institutions, at Northwest Georgia Bank. The charges of interstate transportation of forged checks were based upon his use of D.A.P. Enterprise checks drawn on the account of Heritage Exchange without authorization.
 
 
 5
 At trial, Holmes contended that D.A.P. Enterprise and Heritage Exchange had entered into a joint agreement whereby the owner of Heritage Exchange made available to D.A.P. Enterprise a $150,000 line of credit with which to make loans to applicants. Holmes claimed that the agreement provided for him to reimburse Heritage Exchange through half the interest D.A.P. Enterprise received on the loans. He maintained that the checks drawn on the account of Heritage Exchange that were subsequently dishonored were "starter checks" that he had received from Heritage. However, evidence was adduced at trial that Holmes had no ongoing business relationship with Heritage Exchange. In addition, testimony was introduced that he had bought safety paper identical to the safety paper upon which the D.A.P. Enterprise checks were printed. The prosecution also offered evidence that typewriters seized from Holmes' residence were used in several instances to produce some of the printing on the checks.
 
 II.
 
 6
 Holmes contends that the trial court erred in admitting into evidence several hundred loan applications solicited by him from consumers and seized at his residence by federal agents. He asserts that such evidence was unduly prejudicial and should have been excluded under Rule 403 of the Federal Rules of Evidence. We are convinced, however, that the seized loan applications were properly admitted as proof of his intent to carry out a mail fraud scheme.
 
 
 7
 In count one of the indictment, the government alleged that Holmes had engaged in a scheme to defraud twelve named individuals, "among others." Paragraph two of count one provided in part that:
 
 
 8
 Hundreds of people responded to Holmes classified ads by sending in $35 (or, in some instances, lesser amounts). HOLMES sent these people loan applications which they filled out and returned. HOLMES, however, never intended to obtain loans for the people and made no efforts to do so.
 
 
 9
 As part of its case in chief, the government introduced as evidence several hundred completed loan applications it had uncovered during a search of defendant's residence. At the close of the government's case, the trial court granted the prosecutor's motion to dismiss counts one, six, and thirteen because the government had not presented any testimony from the witnesses supporting those counts. Holmes asserts that when the government moved to dismiss count one it abandoned its charge that defendant had perpetrated a mail fraud scheme involving all of the seized loan applications. As a consequence, Holmes argues that the evidence concerning those applications was unfairly prejudicial since it intimated the existence of a scheme far greater than that which the government was seeking to prove at trial.
 
 
 10
 It is not the case that the government dropped its contention that defendant carried out a wide-ranging scheme of mail fraud involving all of the seized loan applications. In seeking dismissal of count one, all the government did was drop that part of the count related to a particular instance of purported fraud. The government realleged the paragraphs of count one, including paragraph two, which set out the dimensions of the overarching scheme. Each of the remaining mail fraud counts incorporated those paragraphs by reference and were alleged as part of the scheme.
 
 
 11
 In the instant case, defendant denied the existence of a scheme to defraud and denied any intent to commit fraud. In order to overcome such a defense, the government introduced the seized loan applications to prove that Holmes intended to defraud the individuals named specifically in the indictment as part of a larger criminal enterprise. The government's strategy was not an uncommon one. The government sought to establish the deliberate nature of those crimes it decided to prosecute in light of the full extent of a defendant's activities. Such a use of "other acts" evidence to show intent is entirely proper under Rule 404(b). See Fed.R.Evid. 404(b).
 
 
 12
 The trial court is accorded very broad discretion in making determinations as to whether evidence should be excluded under Rule 403. United States v. Townsend, 796 F.2d 158, 161-62 (6th Cir.1986). In reviewing the trial court's exercise of its discretion, this court examines the evidence in the light most favorable to the proponent, maximizing its probative value and minimizing its prejudicial effect. United States v. Pollard, 778 F.2d 1177, 1179 (6th Cir.1984). While such evidence is surely damaging, we detect no unfair prejudice to defendant in the admission of the seized loan applications for the purpose of proving intent to defraud. Accordingly we conclude that the trial court did not err in allowing the loan applications into evidence.
 
 III.
 
 13
 Holmes next contends that the trial court's admission of evidence that he allegedly defrauded a credit union in attempting to obtain a loan was a violation of Rule 404(b) of the Federal Rules of Evidence. He argues that he was impermissibly impeached with such "other acts" evidence to give the impression that he was of an untruthful character.
 
 
 14
 As part of his attempted impeachment of Holmes, the prosecutor offered exhibits comprised of an application to open an account at the Detroit Federal Employees Credit Union (DFECU), the W-2 tax forms submitted by defendant to the credit union in support of a loan application, and a letter in support of the loan application. These exhibits were admitted by the trial judge. Under cross-examination, Holmes admitted that he had opened the DFECU account using a false social security number and using his uncle's address as his own. He also admitted that he had submitted false W-2 forms to DFECU and that the letter allegedly sent by Holmes' employer to DFECU was written by defendant.
 
 
 15
 The government asserts that this line of impeachment was permissible as it demonstrated that during the same time in which Holmes held himself out to consumers as one who could obtain loans for others, he could not obtain a personal loan for himself. As a result, the government argues that the evidence of defendant's own loan application had probative value in challenging his denial of any intent to commit fraud in the instant case.
 
 
 16
 We are troubled by the extent to which this evidence had the feel of irrelevant character evidence that was unfairly prejudicial to defendant. If Holmes could not obtain a loan simply because he was poor, or if the misleading loan application had absolutely nothing to do with the crimes that defendant was charged with perpetrating, serious problems of relevance and prejudice would be manifest. It is a stretch of logic to say that because one is not wealthy one cannot provide a loan-finding service to others in good faith. Likewise, evidence of a misleading loan application unconnected to a pending criminal charge might well be impermissible character evidence aimed at intimating that a particular defendant is an "inherently untrustworthy" person.
 
 
 17
 In the instant case, however, defendant admitted that the deceptive loan application was part of his "investigative research" into financial institutions. The application could plausibly be seen as a dress rehearsal for the larger fraud subsequently committed by Holmes. In light of this fact, we conclude that there was enough of a nexus between the evidence regarding defendant's loan application to DFECU and the issue at trial of his intent to defraud such that this evidence was relevant under Rule 404(b) to impeach Holmes.
 
 
 18
 Even if this were not so, the trial court's admission of such evidence would not be reversible error in the case at bar. Defendant did not raise any objections at trial to the government's impeachment tactic. Accordingly we may only reverse the trial court upon a showing of plain error. Fed.R.Evid. 103(d). Plain errors are "those harmful ones that are so rank that they should have been apparent to the trial judge without objection, or that strike at the fundamental fairness, honesty or public reputation of the trial." United States v. Causey, 834 F.2d 1277, 1281 (6th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 2019 (1988). "Appellate courts should resort to the plain error doctrine only in rare cases of exceptional circumstances." United States v. Hernandez, 873 F.2d 925, 929 (6th Cir.1989) (citing United States v. Frady, 456 U.S. 152, 163 (1982)). No such circumstances are present here. We are convinced that the evidence of defendant's deceptive loan application falls within the bounds of that evidence deemed relevant by Rule 404(b). Accordingly we conclude that the trial court committed no error in admitting such evidence.
 
 IV.
 
 19
 Holmes lastly contends that the prosecutor engaged in egregious misconduct sufficient to constitute a due process violation in unfairly impeaching him, in introducing "other acts" evidence in the guise of impeachment, and in improperly arguing that impeachment evidence was substantive fact.
 
 
 20
 Holmes first calls our attention to the prosecutor's impeachment of him as to his prior statements regarding his application for a loan at DFECU. In support of his application, Holmes submitted a W-2 tax form for 1987 and another W-2 tax form for 1988 which showed earnings from D.A.P. Enterprise of $24,000 and $26,000 respectively. At trial, defendant was cross-examined in regard to the truthfulness of those forms. He responded that he was "not sure exactly how much I made ... from D.A.P. Enterprise." (App. 225). Subsequently the prosecution expressed the intention to introduce a prior inconsistent statement which contradicted the information contained in the W-2 forms. Over defendant's objection, the trial court allowed the prosecutor to proceed. The prosecutor then confronted Holmes with his application for welfare benefits. He went on to question him concerning whether, at about the same time he had completed the W-2 forms, he had represented to the Michigan Department of Social Services that his income in the previous year was only $200.
 
 
 21
 Holmes argues that such impeachment was a blatant attempt to inform the jury that he had applied for welfare benefits, thereby evoking unfair prejudice in the minds of the jury. Additionally, Holmes asserts that the prosecutor failed to follow the dictates of Rule 613 of the Federal Rules of Evidence by failing to afford him an opportunity to explain or deny his allegedly inconsistent statement before confronting him with extrinsic evidence.
 
 
 22
 It may be that in certain contexts the probative value attributable to a defendant's application for welfare benefits would be substantially outweighed by the prejudicial effect resulting from the introduction of such evidence. Here, however, we are convinced that the revelations concerning Holmes' socio-economic status were incidental to the prosecutor's purpose in cross-examining him. Holmes put his intent to defraud squarely at issue at trial. As a result, the prosecutor sought to impeach him in order to cast doubt upon his denial of intent. The fact that Holmes declared his income on a welfare application to be far less than what he claimed it to be on a contemporaneous loan application form is clearly relevant to his truthfulness. Our review of trial court Rule 403 determinations is according to an abuse of discretion standard. United States v. Brady, 595 F.2d 359, 361 (6th Cir.1979). We can detect no prejudice to defendant sufficient for us to conclude that the trial court erred in allowing evidence regarding his application for welfare benefits.
 
 
 23
 As to defendant's claim of a violation of Rule 613, we see no such violation. Under Rule 613(b):
 
 
 24
 Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or in the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in rule 801(d)(2).
 
 
 25
 Quite simply, defendant is a party-opponent in the case at bar. As a result, the prosecutor, in confronting defendant with his application for welfare benefits, had no obligation to afford him an opportunity to explain any inconsistent statements contained in the application. As it turned out, the court made it clear to defense counsel that he would be allowed to redirect in regard to Holmes' statements regarding his income. Accordingly no violation of Rule 613(b) is manifest.
 
 
 26
 As part of his claim of prosecutorial misconduct, defendant also argues that the prosecutor introduced "other acts" evidence in the guise of impeachment evidence and used impeachment evidence as proof of substantive facts. He asserts that the government offered the exhibits of his W-2 tax forms and a letter in support of his application for a loan at DFECU for the purpose of impeaching him. However, according to defendant, the prosecutor subsequently argued that the exhibits were evidence of similar acts and proved Holmes' fraudulent intent in accordance with Rule 404(b) of the Federal Rules of Evidence. We have already indicated that the evidence of defendant's loan application at DFECU was relevant to impeach him. Such evidence may, of course, also be relevant to proof of intent or absence of mistake, etc. See Fed.R.Evid. 404(b). As a consequence, no error was involved in the prosecutor arguing to the jury that Holmes' loan application at DFECU was substantive evidence of his intent to defraud.
 
 
 27
 Prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial" in order to constitute a due process violation. United States v. Agurs, 427 U.S. 97, 108 (1976). All of the actions of the prosecutor that defendant objected to in the instant case were permissible under the Federal Rules of Evidence. We therefore reject defendant's contention and conclude that the prosecutor did not engage in misconduct.
 
 V.
 
 28
 We now turn to the government's cross-appeal. The government contends that the district court improperly granted defendant a downward departure from federal sentencing guidelines in order to qualify him for placement in a community corrections center. We agree and remand for resentencing.
 
 
 29
 In defendant's presentence report, the probation department calculated a guideline range of 21 to 27 months. In making its recommendation, the department began with a base offense level of six (§ 2F1.1(a)), adding six points for a loss of more than $70,000 (§ 2F1.1(b)(G)), and an additional two points for obstruction of justice (§ 3C1.1) for a total adjusted offense level of 16. Combining this adjusted offense level with defendant's criminal history category of I produced the final guideline range of 21 to 27 months. The presentence report did not call attention to any factors which would warrant departure from the submitted guidelines. Holmes did not object to the information underlying the report nor did he contest the accuracy of the computations contained therein.
 
 
 30
 At the sentencing hearing, the district court departed from the guidelines and adjusted defendant's sentence downward to 18 months for the purpose of allowing him to be incarcerated at the community correctional facility near his home. The terms of incarceration at such a facility would allow Holmes to be away during the day to continue his employment. In support of his decision, the sentencing judge cited a number of factors that in his view merited downward departure, including Holmes' lack of criminal history, his role as sole supporter of his family, and his enhanced ability to make court-ordered restitution.
 
 
 31
 We review downward departures from the federal sentencing guidelines under a three-part test:
 
 
 32
 First, we determine whether the case is sufficiently unusual to warrant departure, a question of law reviewed de novo. Second, we examine whether the circumstances, if legally sufficient, actually exist in the case at bar, and accept the conclusions of the sentencing court unless clearly erroneous. Third, the direction of the departure must be reasonable.
 
 
 33
 United States v. Harpst, 949 F.2d 860, 862 (6th Cir.1991). See also United States v. Rutana, 932 F.2d 1155, 1158 (6th Cir.1991).
 
 
 34
 The requirement that the case be sufficiently unusual to warrant departure is based upon 18 U.S.C. § 3553(b), which provides in pertinent part that:
 
 
 35
 [t]he court shall impose a sentence ... within the range referred to in subsection (a)(4) unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into account by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.
 
 
 36
 18 U.S.C. § 3553(b). The sentencing judge is only to depart from the base levels imposed by the guidelines where expressly permitted by the guidelines. Harpst, 949 F.2d at 862. "[A] sentencing court should not treat as unique or unusual factors, those circumstances that the guidelines have already taken into account or expressly deemed irrelevant." United States v. Brewer, 899 F.2d 503, 511 (6th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 127 (1990). With these considerations in mind, we turn our attention to the legal sufficiency of the sentencing judge's reasons for downward departure in the instant case.
 
 A. Lack of Prior Criminal History
 
 37
 This factor is expressly accounted for in the criminal history scoring system included in the sentencing guidelines. The policy statement contained in United States Sentencing Guidelines § 4A1.3 (Adequacy of Criminal History) provides clearly that:
 
 
 38
 The lower limit of the range for a Category I criminal history is set for a first offender with the lowest risk of recidivism. Therefore, a departure below the lower limit of the guideline range for a Category I criminal history cannot be appropriate.
 
 
 39
 Consequently defendant is not entitled to a further reduction in sentence due to his status as a first-time offender. By being classified as a Category I offender, he has been given all of the credit for his lack of prior criminal history that the sentencing guidelines permit. See United States v. Todd, 920 F.2d 399, 409 (6th Cir.1990).
 
 B. Family Responsibilities
 
 40
 Holmes' commitment to his wife and three children as sole supporter, while compelling, does not support a downward departure in sentence. Section 5H1.6 of the sentencing guidelines states specifically that:
 
 
 41
 Family ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range.
 
 
 42
 U.S.S.G. § 5H1.6. We have held previously that although incarceration may impose hardship upon innocent family members, including children, a departure downward in sentencing is not justified on that basis except in unusual circumstances. Brewer, 899 F.2d at 504. There are no facts in the record of the instant case that indicate extreme hardship beyond that which is to be expected when a primary breadwinner is separated from the family. In accordance with the plain statutory language of § 5H1.6, we therefore conclude that defendant's family commitments were an improper basis for a downward departure in sentencing.
 
 
 43
 C. Self-Employment/Ability to Make Restitution
 
 
 44
 In his statement of reasons for departing from the sentencing guidelines, the sentencing judge refers to Holmes' self-employment as a factor in his decision to reduce his sentence. It is unclear whether the sentencing judge considered defendant's employment status due to his role as sole supporter of his family or because it would affect his ability to make restitution. We have already held that the family responsibilities of defendant do not justify a downward departure from the sentencing guidelines. We are equally convinced that the effect that incarceration would have on defendant's employment status, and hence his chances of making timely restitution, does not justify a reduced sentence in the instant case. The policy statement included in U.S.S.G. § 5H1.5 (Employment Record) provides that:
 
 
 45
 Employment record is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. Employment record may be relevant in determining the conditions of probation or supervised release (e.g., the appropriate hours of home detention).
 
 
 46
 As a consequence, a sentencing judge may take a defendant's employment record into account for the purpose of effecting restitution in certain circumstances. However, the statutory language is clear that those circumstances are limited, except in unusual instances, to where a defendant is eligible for either probation or supervised release. Given the nature of Holmes' offense in the case at bar, he was not eligible for a sentence of probation. See U.S.S.G. § 5B1.1(a). There is nothing in the record to suggest that the need for timely restitution is greater in this case than in any other. Accordingly, we hold that defendant's employment status was not an appropriate basis on which to base a departure from the sentencing guidelines.
 
 
 47
 After thorough consideration, we conclude that the reasons given by the sentencing judge for departing downward in sentencing are legally insufficient. As a consequence, we need not go further in our review of defendant's sentence. We hold that the district court erred in reducing defendant's sentence beyond the guideline range provided in the federal sentencing guidelines.
 
 VI.
 
 48
 The judgment of the district court, except in regard to sentencing, is AFFIRMED. We REMAND FOR RESENTENCING consistent with this opinion.