UNITED STATES of America,
Plaintiff–Appellee,

v.

Michael BROWN (01–5139), Marcus Boyd (01–5205), and Calvin Boyd (01–5206), Defendants–Appellants.

Nos. 01–5139, 01–5205, 01–5206.

United States Court of Appeals,
Sixth Circuit.

Dec. 26, 2002.

Before MARTIN, Chief Circuit Judge, RYAN, Circuit Judge, and COHN, District Judge.*

COHN, District Judge.

This is a criminal case. Defendants–Appellants Michael Brown (Brown). Marcus Boyd. and Calvin Boyd appeal from their separate jury convictions on various drug conspiracy and firearm-related offenses described below. Brown presents three issues on appeal—whether the evidence was sufficient to support his conviction, whether the district court committed trial errors, and whether the district judge should have recused herself from the case. Marcus Boyd and Calvin Boyd both argue that the evidence was insufficient to support their convictions. For the reasons set forth below, we find no reversible error

and therefore AFFIRM the defendants' convictions.

## I. Background

### A.

Defendants' separate convictions stem from a widespread drug conspiracy which also involved the murder of two persons. The evidence at each of the trials was established largely by the testimony of the following persons, some of whom had prior felony convictions and who agreed to testify for the government.[1] Wynterence Moultry of the Memphis Police Department (uniform patrol), Danny James of the Memphis Police Department (crime scene), Thomas Deering (medical examiner), Terry Arney of the Tennessee Bureau of Investigation (firearms expert), Jackie Arnold, Roderick Kelley, Tyrone Crane, Franchesca Tyler, Antonio Bogard, Lanail Allen, Robert Taylor, and Jason Coleman. Although the defendants were separately tried, substantially the same evidence was presented at each of the trials, except as specifically noted.

On March 13, 1999, a Memphis police officer received a call of shots fired at the parking lot of a body shop in Memphis, Tennessee. The officer responded and found two persons dead at the scene, apparently having been shot several times. The officer was given a description to be on the lookout for two African–American men, one of whom might be dressed in black. The officer saw two persons at the scene who fit this description. When the officer approached them, they fled. The officer eventually caught one of the men, who was later identified as Brown. The

---

* The Honorable Avern Cohn. United States District Judge for the Eastern District of Michigan. sitting by designation.

1. The record is unclear as to the precise details of the various witnesses' agreements with the government. However, the fact that the witnesses had agreements with the government in exchange for their testimony, including the sentences they received as a result of their agreements, was brought out at all of the defendants' trials.

officer found a nine millimeter pistol on Brown. Ballistic tests determined that two firearms had been used in the shooting. Several bullets, bullet fragments, and shell casings recovered at the scene matched Brown's pistol. The victims were identified as Sid Towns and Omar Stokes.

The evidence at trial showed that Towns and Stokes were killed because they lost money given to them by Marcus Boyd for a drug deal that they were to have completed in Houston. Texas. A summary of some of the witnesses' testimony follows.

Jackie Arnold. who pled guilty to a drug offense under a Rule 11 agreement and had prior felony convictions, testified that he was a source of marijuana for Marcus Boyd when he was a student at Tennessee State University. He testified that Marcus Boyd obtained 50 pounds of marijuana almost daily and that later the amount increased to 100 pounds several times a week. Arnold also testified that he supplied Marcus Boyd with cocaine and that Marcus Boyd would convert the cocaine to crack. Arnold estimated that he supplied Marcus Boyd with 2,000 pounds of marijuana and in excess of 50 kilograms of cocaine between September 1997 and September 1998. Arnold testified that his source of the drugs was an individual named Roderick Kelley. Arnold further testified that he supplied Marcus Boyd until Marcus Boyd began dealing directly with Kelley after September 1998.

Roderick Kelley, also a convicted felon who cooperated with the government, testified that he was the source for Arnold, and later for Marcus Boyd. Starting in September 1998, Kelley supplied Marcus Boyd with marijuana and cocaine. From September 1998 to December 1998, Kelley supplied Marcus Boyd with more than 20 kilograms of cocaine and several hundred pounds of marijuana. At Brown's trial,

Kelley testified that Brown was present for one of the marijuana deliveries.

Tyrone Crane, who pled guilty to a drug offense under a Rule 11 agreement, testified that he worked with Marcus Boyd and Michael Brown to acquire and distribute marijuana and cocaine. He testified that he picked up marijuana with Marcus Boyd on several occasions and also picked up cocaine and was present when the cocaine was converted to crack. Crane also named Steve Skinner and Carlos Wardlow as involved in the same activities.

Franchesca Tyler, Towns' fiancee, testified that Marcus Boyd delivered $53,700.00 to Towns before Towns left for Houston.

Antonio Bogard testified that he traveled with Towns and Stokes to Houston but did not know the purpose of the trip. He also testified that when Towns lost the money, Bogard went back to Memphis.

Lanail Allen testified that he lives in Houston and is in the music industry. He testified that Stokes owed him $15,000.00 for producing two music tracks for him in 1999. He also testified that Stokes called him asking where he could buy some cocaine. Allen told Stokes he knew a buyer but did so only to get his money from Stokes. He admitted to taking $51,000.00 from Stokes in Houston.

Robert Taylor testified that he had stolen a white Chrysler Sebring with another person and that Marcus Boyd agreed to buy it from them. He also testified that Brown was with Marcus Boyd when he bought the car.

Jason Coleman was a student at Tennessee State University and friend of Marcus Boyd. He testified at Brown's and Marcus Boyd's trials. Coleman apparently drove the getaway car for the murderers but was not charged in the case. He testified that while he was sleeping. Marcus Boyd woke him up and told him to drop Brown and

Calvin Boyd off at the body shop, because he was owed money by the victims. He testified that he did not see the shootings but that all of the defendants were present at the scene and that he fled the scene when he heard the shooting. He also testified in Brown's trial that after he fled, he was picked up by Wardlow's girlfriend and taken to Marcus Boyd's house where Marcus Boyd, Skinner and Wardlow were present. Calvin Boyd later arrived and said that the police had arrested Brown. Some of the conspirators then discussed possible alibis; Marcus Boyd said he would say he was with his sister at the time.

Carlos Wardlow pled guilty to the murders of Towns and Stokes under a Rule 11 agreement. He testified at Michael Brown's trial that he dealt drugs with Marcus Boyd and also implicated Marcus Boyd in the murders. Wardlow testified that Marcus Boyd told him that Stokes stole money from him and that Stokes and Towns had to be killed. They then rounded up Skinner, Calvin Boyd, and Michael Brown, who met the victims at the body shop. Wardlow testified that Calvin Boyd actually killed Towns and Stokes.

Wardlow's girlfriend, Latoya Duckett, verified Coleman's version of the events. She also testified at Michael Brown's trial that Calvin Boyd talked about how many times he shot the victims.

Anthony Carniglia, an inmate serving time on unrelated charges and under no agreement with the government, testified at Marcus Boyd's trial that he was in a cell next to Skinner. He testified that Skinner said he was the one who ordered the "hit" on Stokes and Towns.

After being arrested and given *Miranda* warnings, Brown told police about his role in the conspiracy and in the murders. Brown told police that Marcus Boyd gave $150,000 to Stokes and Towns to buy co-

caine but that they went to Texas and were robbed and lost the money. Brown said that Marcus Boyd ordered the "hit" on Stokes and Towns. Brown also admitted to shooting the victims and identified Calvin Boyd as the other shooter. Brown's statements were admitted at trial.

Calvin Boyd also spoke to police after he was arrested and given *Miranda* warnings. He eventually told police about his role in the conspiracy and the murders. He also said that he believed Stokes and Towns lost the money given to them by Marcus Boyd in a drug deal in Chicago and that Marcus Boyd recruited him to kill them in retaliation for losing the money. Calvin Boyd prepared two signed and typed statements implicating Brown and Marcus Boyd in the murders. Calvin Boyd's statements were admitted at trial.

Marcus Boyd testified in his own defense. He testified that he was a full-time student at Tennessee State University at the time of the events. He admitted to being present during the murders, but he did not know what was going to happen. He thought that Calvin Boyd and Brown were there only to rob the victims. He also said that Skinner was the one who told him to go to the body shop, that Skinner planned the killings, and that he went inside the body shop to tell Towns and Stokes what Skinner had planned. He testified that he was outside the body shop when the gunfire erupted. He testified that Calvin Boyd later described how he had shot the victims and that Skinner congratulated him.

### B.

On October 20, 1999, a federal grand jury returned a five-count indictment against defendants charging them with (1) conspiracy to possess and distribute cocaine and cocaine base: (2) conspiracy to

possess and distribute marijuana, in violation of 21 U.S.C. § 846; (3) discharging firearms during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c): and (4) and (5) two counts of causing death through the use of firearms during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(j) (counts 4 [Omar Stokes] and 5 [Sid Towns]). On January 20, 2000, the same grand jury returned a superseding indictment charging the defendants with the same five offenses. The defendants' cases were severed for trial, which began in October 2000.

Brown's trial began on October 2, 2000. On October 6, 2000, the jury returned verdicts of guilty against Brown on all counts of the superseding indictment. On January 11, 2001, the district court sentenced Brown to life imprisonment for counts one (conspiracy to possess and distribute cocaine and cocaine base), four and five (causing death through the use of firearms during and in relation to a drug trafficking offense), and 480 months confinement for count two (conspiracy to possess and distribute marijuana), all to be served concurrently. The district court ordered a consecutive term of 120 months confinement for count three (discharging firearms during and in relation to a drug trafficking offense).

Calvin Boyd's trial began on October 10, 2000. At the end of the government's proofs, the district court granted his motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 on count two of the superseding indictment (the marijuana conspiracy count). On October 13, 2000, the jury returned verdicts of guilty against Calvin Boyd on counts one, three, four, and five. On January 11, 2001, the district court sentenced Calvin Boyd to life imprisonment for counts one, four, and five, to be served concurrently. The district court ordered a consecutive term of 120 months confinement for count three.

Marcus Boyd's trial began on October 23, 2000. On October 27, 2000, the jury returned verdicts of guilty on all counts of the superseding indictment. On January 11, 2001, the district court sentenced Marcus Boyd to life imprisonment on counts one, four, and five, to be served concurrently. The district court ordered a consecutive term of 120 months confinement for count three of the superseding indictment.

## II. Basis for Appellate Jurisdiction

The indictments were returned in U.S. District Court for the Western District of Tennessee, where the district court exercised jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291. All defendants filed timely notices of appeal under Federal Rule of Appellate Procedure 4(a).

### III. Analysis

#### A. Appeal No. 01–5139— Michael Brown

##### 1. Insufficient Evidence— Drug Conspiracies

█ Brown first argues that the government failed to establish beyond a reasonable doubt the elements of the conspiracy charged in counts one and two specifically relating to Brown and that the district court should have granted his motion for acquittal on these counts. Brown argues that in the proof related to the drug conspiracy, the government witnesses were admitted suppliers of Marcus Boyd but testified they never dealt with, sold to, or spoke with Brown. Brown also argues that because there was insufficient evidence to convict him of count one, counts three, four, and five should have been dis-

missed. The government argues that there was sufficient evidence at trial to show Brown's knowledge of and participation in the drug conspiracies, including his own statements.

The standard of review of a claim of insufficient evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Ellzey,* 874 F.2d 324, 328 (6th Cir.1989) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). We review the district court's denial of a motion for judgment of acquittal *de novo. United States v. Keeton,* 101 F.3d 48, 52 (6th Cir.1996).

In order to establish a conspiracy under section 846, the government must prove, beyond a reasonable doubt, "(1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy." *United States v. Welch,* 97 F.3d 142, 148 (6th Cir.1996). An agreement need not be express to form a conspiracy. "A tacit or mutual understanding among the parties is sufficient" to qualify as an agreement in a conspiracy charge. *United States v. Forrest,* 17 F.3d 916, 918 (6th Cir.1994). No formal agreement is required. *United States v. Sanchez,* 928 F.2d 1450, 1457 (6th Cir.1991). A conspiracy requires:

> (1) An object to be accomplished. (2) A plan or scheme embodying means to accomplish that object. (3) An agreement or understanding between two or more of the defendants whereby they become definitely committed to cooperate for the accomplishment of the object by the means embodied in the agreement, or by any effectual means.

*United States v. Bostic,* 480 F.2d 965, 968 (6th Cir.1973).

Here, the government presented enough evidence for a reasonable jury to find all of the elements of a conspiracy as charged in counts one and two against Brown beyond a reasonable doubt. Brown argues that the only agreement he had was with Marcus Boyd, which was a murder-for-hire, and that there was no evidence that the murder was done in furtherance of the conspiracy. We disagree. Brown's own statements implicate him in the conspiracy. He knew that Marcus Boyd was a drug dealer and that the victims owed Marcus Boyd money. A rational jury could have found that Brown's role was to protect the proceeds of the conspiracy and to retaliate against those who would steal or threaten its assets. Moreover, Crane testified that Brown had sold drugs for Marcus Boyd. Although Crane did admit on cross examination that he had never before implicated Brown as a seller, even in his testimony before the grand jury, the jury was able to assess Crane's credibility.

Moreover, the district court did not err in denying Brown's motion for acquittal under Federal Rule of Criminal Procedure 29 on counts one and two. The district court found that the evidence showing Brown's participation in the murder was a strong indication that he was also involved in the activities that led to the murder, i.e. the drug conspiracy. Even though the evidence was that Brown had a fairly limited role in the drug transactions themselves, the evidence of his role in the murder strongly supported the notion that he provided protection and security for the drug conspiracy. We agree. In short, there was sufficient evidence to support Brown's conspiracy conviction in counts one and two.

### 2. Evidentiary Errors

Brown argues that the district court made several evidentiary errors in the ad-

mission and exclusion of evidence. We review the district court's rulings for an abuse of discretion. *United States v. Bonds*, 12 F.3d 540, 554 (6th Cir.1993).

### a. State–Court Indictments

■ Brown argues that his defense was to attack the evidence offered by the government regarding Brown's role in the drug conspiracies. He wanted to offer state-court indictments returned against him in Shelby County Criminal Court to the jury to establish that he would still face murder charges in state court even if the jury agreed with his defense and acquitted him of the drug conspiracy charges. Brown argues that the juror's notes made during their deliberations, particularly one asking what would happen if they could not agree as to count one, indicate that they were concerned they would be letting Brown go free if they could not agree on count one. Brown says the district court's refusal to allow him to present evidence regarding state-court indictments denied him a complete defense. Brown's defense at trial was that although he admitted to the murders, he claimed not to be a part of the drug conspiracy.

■ The government argues that proof of state-court indictments would not make Brown's participation in the drug case more or less probable and that the district court correctly ruled that admitting the indictments would be irrelevant and misleading. We agree. The district court did not abuse its discretion. First, the pending state-court indictments were irrelevant as to the federal charges. Second, admitting the state-court indictments in evidence would be very misleading, because Brown was not charged with a conspiracy to commit murder but rather was taking part in a drug conspiracy during which a murder was committed.

### b. Photographs

Brown next argues that photos of the deceased introduced by the government were irrelevant and highly prejudicial because they offered no support of any disputed fact. Brown argues that the photos appealed to the jurors' prejudices about the nature of the killings and not the disputed issues at trial.

The government argues that the photos had substantial evidentiary value and that any prejudicial effect did not outweigh their probative value. The government argues that the photos provided the jury with proof that the victims were killed by multiple gunshot wounds at a location where they had been lured by other conspirators. The government also points out that the victims were fully clothed, and the photos were not gory but rather the photos showed the victims where they lay on the parking lot with items in their possession at the time of their deaths. The government further notes that it was required to prove that the murders were premeditated, and these photos were probative as to that fact.

In *United States v. Brady*, 595 F.2d 359 (6th Cir.1979), cited by the government, this court found that the district court did not abuse its discretion in admitting photographs of the dead victims of a robbery even though the cause of death was not disputed, and the photographs showed the victims lying in pools of their own blood. This court explained that the photographs were probative on the issue of whether the killings were committed in the course of a robbery, and their admission was not outweighed by any prejudicial effect. *See Brady*, 595 F.2d at 361–62.

■ Here, as in *Brady*, the photographs were relevant to show that the murders were in furtherance of the drug conspiracy. They were therefore properly

admitted. The evidence at trial showed that the victims had been lured by the co-conspirators to the body shop and were killed by multiple gunshot wounds, and the photographs of the scene were probative of the murders having been in furtherance of a drug conspiracy. Moreover, we note that the district court carefully reviewed the government's proffered photographs and limited the photographs that could be introduced, excluding those that were du-plicative, and those that were "substantial-ly more prejudicial because of the nature of the wounds."

### 3. Jury Instructions

Brown also argues that the district court abused its discretion by reinstructing the jury as to the offense in count one in a manner that was misleading, inaccurate, and beyond what was discussed at the charge conference. Brown says the jury asked the court for the definition of "pos-session," and the district court told the jury that it did not need a definition of "possession" for counts one and two. Brown argues that no additional instruc-tions should have been provided and that the court's remarks diminished the impor-tance of the word "possession" in the jury's deliberations.

The government argues the district court's actions were well within its discre-tion. because a district court's duty is to provide necessary law to a jury that has expressed a concern about an issue. The government also argues the court an-swered the jurors' questions, explained what was necessary and what was unnec-essary and appropriately directed the ju-rors to the language in the charge they had already received.

During the jury deliberations, the dis-trict judge who presided over the trial had to leave the jurisdiction, and another dis-trict judge filled in in her absence. Dur-ing this time, the jury sent the following note:

"Please provide the definition of posses-sion.

Need clarification of paragraphs 2 and 3 on page 16 and paragraph 3 on page 17 of the jury instructions. They appear to be in conflict. We cannot get beyond this conflict."

After a discussion with counsel, the dis-trict judge presiding recessed to attempt to reach the trial judge by phone. She then re-read the definition of possession as it related to count three (the drug posses-sion count) of the indictment. As to the second question, the district judge re-read the instructions that concerned the jury. Brown's counsel had previously suggested that the jury not be told anything, because the parties had ample opportunity to cor-rect any shortcomings in the instructions. He also said that telling the jury that possession is not an element of the con-spiracy charge, but an element of the charges encompassed in the conspiracy might be confusing. After the repeated instructions, the jury left the courtroom. The district judge noted on the record that she saw a juror shake his head as if the reinstruction was not helpful. About thir-ty minutes later, the jury sent a note stating that it was getting "nowhere" and asked to retire for the day, at which point they were excused.

The original trial judge was back for the next day of deliberations and decided to address any problems the jury continued to have before they began their delibera-tions for the day. The trial judge told counsel that if the jury said that their first question (about the definition of posses-sion) was referring to the conspiracy counts, she would explain that they did not need to know the definition of possession in order to decide the issues involved in those counts. She also said that she would

tell the jurors that it was not necessary for them to find that the defendant or anyone else possessed with the intent to deliver a controlled substance in order to establish the conspiracy alleged in counts one and two. Brown's counsel restated his position that the jury not be told anything.

The trial judge brought the jurors into the courtroom where they indicated they had directed the first question to counts one and two, at which point the district judge said "You do not need a definition of possession with respect to Count 1 and 2 and that's why you don't have it." She then said that the government had to prove beyond a reasonable doubt that either two or more persons conspired or agreed to commit the crime of possession of a controlled substance with the intent to distribute or the actual distribution of a controlled substance. As to their second question, the trial judge explained that the instructions to which the jury referred were not in conflict but rather explained out different elements of the conspiracy offenses (one being about the "agreement" and the other being about whether the defendant "knowingly and voluntarily" joined the agreement). She then explained how their question applied to the different elements. The trial judge finally read the portions of the instructions and reminded them to consider the instructions as a whole.

The jury later asked the question "What happens if we cannot reach a unanimous verdict?" The trial judge replied that if you are unable to make further progress, you should report that fact to the court by a note. Later that day, the jury returned a guilty verdict.

■ The trial court is entitled to exercise its discretion in deciding how best to respond to inquiries made by the jury during its deliberations. *See United States v. Nunez*, 889 F.2d 1564, 1568 (6th Cir.1989). "In response to a jury's question after it has begun deliberating, however, a trial judge may and should make clear the law the jury is bound to apply, though it is not his province to advise the jury of collateral aspects of its decision." *Id.* (*quoting United States v. Rowan*, 518 F.2d 685, 693 (6th Cir.1975)). *See also United States v. Brown*, 276 F.3d 211, 216 (6th Cir.2002). When a jury seeks clarification of particular issues, however, the judge should clear away its difficulties "with concrete accuracy." *Bollenbach v. United States*, 326 U.S. 607, 612–13, 66 S.Ct. 402, 90 L.Ed. 350 (1946). When a jury indicates confusion about an important legal issue, it is not sufficient for the court to rely on more general statements in its prior charge. "A conviction ought not to rest on an equivocal direction to the jury on a basic issue." *Id.* at 613.

■ Having carefully reviewed the record, we find no reversible error in the jury instructions or handling of the jury questions. We do, however, note that counts one and two charged Brown with conspiracy to possess with intent to deliver marijuana and cocaine. While the clear focus of the charge is the conspiracy, we do not agree with the district court's statement that the jury need not be concerned about the definition of possession in order to convict Brown. Possession of drugs is the offense underlying the conspiracy. When the jury indicated that it wanted a definition of possession, the better practice would have been to provide an instruction on the underlying offense of possession with intent to distribute coupled with a comment that the focus of the charges is on the conspiracy, not possession. In any event, Brown's counsel did not make such a request, and the error, if any, was harmless.

## C. Recusal

■ Brown lastly argues that the district court violated his due process right to a fair trial in denying his motion for recusal. Brown argues that the district judge who tried the case could not be impartial, because she is married to the District Attorney General for the Thirteenth Judicial District of Tennessee whose office prosecuted Brown on state murder charges. The government argues that impartiality should not be questioned, because the state district attorney's office had no part in Brown's federal prosecution and the district court has no part in Brown's state prosecution.

In denying the recusal motion, made by all three defendants but only challenged by Brown on appeal, the district judge explained that the fact that her husband heads the office which is prosecuting the state case against Brown would not cause a reasonable person to question her impartiality. We agree. Section 455(a) of Title 28 provides that a federal judge shall disqualify herself in any proceeding in which her impartiality might reasonably be questioned. *See also* Code of Conduct for United States Judges, Canon 2A. We have stated that the district judge is required to recuse herself under section 455 "only if a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *Wheeler v. Southland Corp.*, 875 F.2d 1246, 1251–52 (6th Cir.1989). This is not such a case. The district court did not abuse its discretion in denying Brown's motion for recusal.

## B. Appeal No. 01–5205—Marcus Boyd

■ Marcus Boyd presents a single issue on appeal, a challenge to the sufficiency of the evidence against him. He argues that the four key witnesses who testified against him at trial were all criminals testifying solely to reduce their own sentences. He also argues only one of the four witnesses directly implicated him and that no reasonable juror could have found him guilty beyond a reasonable doubt based on their testimony.

Marcus Boyd's argument goes to the heart of the function of a jury—to determine issues of credibility. That the witnesses who testified against Marcus Boyd were convicted felons who made deals with the government was known to the jury. That the jury chose to believe their version of events rather than Marcus Boyd's is well within its province. Having reviewed the evidence at trial and Marcus Boyd's involvement, as described in detail above, we find it more than sufficient for a rational jury to convict Marcus Boyd of the charged crimes beyond a reasonable doubt.

## C. Appeal No. 01–5206—Calvin Boyd

■ Calvin Boyd argues that his guilt in this case is slight and rests on the testimony of two government witnesses— two police officers who took his statements in 1999. Calvin Boyd argues that the officers' testimony differs significantly from his 1999 statements and that the officers were "testilying" in district court for the sole purpose of conferring federal jurisdiction over his offense. The government argues that Calvin Boyd did not argue veracity or credibility of the government's witnesses to the district court, and furthermore sufficient evidence exists to support his conviction.

We note that the district court granted Calvin Boyd's motion under Federal Rule of Criminal Procedure 29 in part, dismissing count two (the marijuana conspiracy count) against him. As to count one, the district judge found that Calvin Boyd's own oral and written statements to the police, as well as witnesses' testimony, pro-

212

vided sufficient proof of his knowledge of the purpose of the murders—that they were in retaliation for having lost money intended for a drug deal, as well as his role in the overall drug conspiracy. We agree. The district judge accurately marshaled the evidence at trial against Calvin Boyd. From the evidence we have described above, and for the reasons given by the district judge, we conclude that a rational juror could have found him guilty of the charged crimes beyond a reasonable doubt.

## IV. Conclusion

For the foregoing reasons, we affirm the defendants' convictions.